COMMONWEALTH of Pennsylvania, Appellee

v.

Craig SAUNDERS, Appellant.

Superior Court of Pennsylvania.

Submitted Jan. 22, 2008.
Filed April 4, 2008.

Craig Saunders, appellant, pro se.

Hugh J. Burns, Jr., Asst. Dist. Atty., Philadelphia, for Com., appellee.

BEFORE: STEVENS, MUSMANNO, and HUDOCK, JJ.

OPINION BY STEVENS, J.:

¶ 1 This is a *pro se* appeal *nunc pro tunc* from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County following Appellant's conviction on the charge of conspiracy to commit escape. Appellant contends (1) the evidence was insufficient to sustain Appellant's conviction; (2) the Commonwealth used its challenges to strike African–American women from the jury in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); (3) the trial court improperly limited Appellant's cross-examination of expert witness George Corbiscello; (4) Appellant had a constitutional right to be indicted by a grand jury; and (5) Appellant's sentence was illegal in violation of *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).[1] We affirm.

¶ 2 The relevant facts and procedural history are as follows: On September 12, 2000, Appellant and his cohort, Selwyn Brown, invaded the victim's home. Inside, after demanding $20,000.00, Brown raped the victim while Appellant held her three minor daughters and an eighteen-year-old boy, who was visiting, at gunpoint. After the rape, Brown forced the victim to drive him to another location, while Appellant and another cohort, Harlan Smith, held the children at gunpoint in the basement. Eventually, Brown freed the victim, and Appellant and his cohorts fled.

¶ 3 Thereafter, the victim saw Brown in the neighborhood and police arrested him. While Brown was in custody, Appellant and several other men unsuccessfully planned his escape from prison. Eventually, Appellant was arrested and charged with conspiracy to commit the escape of Brown.[2]

¶ 4 On September 13, 2004, Appellant proceeded to a jury trial for conspiracy to commit the escape of Brown. In its opinion, the trial court has adequately set forth the evidence, which was presented during Appellant's jury trial:

> The appellant visited Brown on numerous occasions at Graterford prison to plan the escape. At each visit, the appellant signed his name in the visitor's log book, produced identification, and was filmed as part of the normal security procedures at Graterford. (N.T. 9/15/04, pgs. 31–32, 36, 51–52). Named codefendants Kevin Holmes (Holmes) and Reginald Nesmith (Nesmith) also visited Brown in prison. (N.T. 9/15/04, pgs. 37–39). Prison phone records indicated that eight-seven (87) calls were

---

1. We have renumbered Appellant's issues for the sake of effective appellate review.

2. Appellant was also charged with and convicted of numerous crimes, including rape and burglary, in connection with the September 12, 2000 incident, and he was sentenced to 48½ to 97 years in prison. This Court affirmed his judgment of sentence, *Common-* *wealth v. Saunders*, 838 EDA 2004, 918 A.2d 791 (Pa.Super. filed 12/1/06) (unpublished memorandum), and Appellant did not file a petition for allowance of appeal. Presently before this Court is Appellant's judgment of sentence only as it relates to the crime of conspiracy to commit escape.

made by Brown while he was in county custody. (N.T. 9/20/04, pgs. 156–159). Three witnesses identified the appellant's voice on multiple tapes of phone conversations with Brown. (N.T. 9/22/04, pgs. 109–110, 123–125). During the visits to the prison and the numerous phone calls, Brown and the appellant crafted the plan to free Brown from custody at gunpoint while he was leaving Family Court on the day of Brown's preliminary hearing in the [rape] case.[3]

The appellant and Brown used a code to communicate during these visits and phone calls that is common to the Five–Percent Nation. Brown and the appellant both claim affiliation with the Five–Percent Nation.[4] (N.T. 9/13/04, pgs. 105, 133–135; 9/22/04, pg. 95).

Daniel Olson, supervising forensic examiner in the cryptanalysis and racketeering records unit for the Federal Bureau of Investigation, testified as an expert in code deconstruction. (N.T. 9/20/04, pgs. 212–223). He testified that Brown and the appellant used a code called the "Supreme Alphabet" to discuss the escape plan. (N.T. 9/20/04 pgs. 223–272; 9/20/04, pgs. 245–246, 249, 250–252). Additionally, George Corbiscello, Senior Investigator for the Monmouth County Sheriff's Office, testified as an expert on the Five–Percent Nation and its communication-both oral and written, and he likewise identified the Supreme Alphabet. (*See generally* N.T. 9/21/04, pgs. 113–155). Both ex-

perts translated conversations between Brown and the appellant. (N.T. 9/20/04, pgs. 244–265; 9/21/04, pgs. 134–155). The translation revealed that the appellant agreed to ensure that a car was present on 18th Street and that men would be present with guns as Brown was leaving Family Court. The plan called for these men to confront the sheriffs, secure Brown's person and escape in the car heading North. (N.T. 9/14/04, pgs. 196–197).

On July 2, 2001, as [the victim] and her daughters entered Family Court at 1801 Vine Street, Nesmith and Holmes were present in the courtroom where Brown's preliminary hearing was to be held. (N.T. 9/15/04, pg 185). As Brown was escorted into the courtroom, he nodded at Nesmith and Holmes. *Id.* Following the hearing, at which she testified, [the victim] exited the courthouse with her daughters. [The victim] and other witnesses saw two men walking down from 18th and Wood Streets toward the sheriff's driveway, each holding a gun.[5] (N.T. 9/14/04, pgs. 62–63, 82).

[The victim] grabbed her daughters, ran to her car in the parking lot and drove off. (N.T. 9/14/04, pg. 85). Family Court security and the police were advised of the men with guns. As police arrived, four (4) black males, matching the descriptions that had been given, were seen at the corner of 18th and

---

**3.** All preliminary hearings involving crimes against minors are conducted at Family Court located at 1801 Vine Street in the City and County of Philadelphia.

**4.** The basic philosophy of the group is to instruct its members that eight-five (85) percent of the world is people of color who have been subjugated by the remaining ten (10) percent who are Caucasian. The five (5) percent who remain believe that they are on the

path of righteousness, and it is their job to find the other eight-five (85) percent and lead them to the path of righteousness. Appellant's name within this organization was "Supreme Universal Master Allah." (N.T. 9/21/04, pgs. 109–110, 133–135).

**5.** Unbeknownst to the men with guns, Brown had left the court house earlier. (N.T. 9/15/04, pg. 186).

Wood Streets standing by a tan Oldsmobile. The men fled as police arrived and a chase ensued. (N.T. 9/22/04, pgs. 61–62). A handgun was recovered at the 1600 block of Carlton Street after one of the males threw it on the ground. (N.T. 9/20/04, pgs. 54–55, 58). At 18th and Carlton Streets, the Oldsmobile was left unoccupied with the engine running. (N.T. 9/20/04, pgs. 93–96, 100). Police recovered a black duffle bag next to the left front tire of the car which contained a black semi-automatic handgun known as a Tech–9 with several magazine clips. (N.T. 9/22/04, pg. 20). The car was registered to Brown. (N.T. 9/22/04, pg. 126). Co-defendant Holmes later returned to the vehicle while it was being guarded by police and attempted to retrieve it. (N.T. 9/22/04, pgs. 133–134).

On July 2, 2001, after returning to prison, Brown discussed the failed escape plan with the appellant. (N.T. 9/14/04, pgs. 196–197). Brown demanded to know why the appellant had not executed the agreed upon plan. Appellant explained that they had in fact been at the courthouse but the plan failed. *Id.* Brown asked the appellant, "where's the car at?" The appellant responded: "On 18th ..." Brown stated: "You got my car just sitting out there running ... where is the gun?" Appellant responded: "In the car." *Id.*

Trial Court Opinion filed 9/13/07 at 2–5 (footnotes in original).

¶ 5 The jury convicted Appellant of conspiracy to commit the escape of Brown, and on September 30, 2004, the trial court sentenced Appellant to three and one-half years to seven years in prison. Appellant filed an untimely post-sentence motion, which the trial court denied, and his untimely notice of appeal was dismissed. Thereafter, Appellant's direct appeal rights were reinstated via a timely petition filed under the Post Conviction Relief Act, 42 Pa.C.S.A. §§ 9541–9546, and following a *Grazier*[6] hearing, he was permitted to proceed *pro se.* By order entered on September 15, 2006, the trial court ordered Appellant to file a Pa.R.A.P.1925(b) statement, and Appellant timely complied.[7] The trial court filed a Pa.R.A.P.1925(a) opinion.

■ ¶ 6 Appellant first contends the evidence was insufficient to sustain his conviction for conspiracy to commit the escape of Brown.

In examining a challenge to the sufficiency of the evidence, we must determine whether, viewing all the evidence admitted at trial in the light most favorable to the Commonwealth, there is sufficient evidence to enable the fact finder to find every element of the crime beyond a reasonable doubt.... The established facts and circumstances do not have to be absolutely incompatible with the accused's innocence, but any doubt is for the factfinder unless the evidence is so weak and inconclusive that no probability of fact can be drawn from the totality of the circumstances as a matter of law.

*Commonwealth v. Lyons,* 833 A.2d 245, 258 (Pa.Super.2003) (citations omitted).

¶ 7 18 Pa.C.S.A. § 5121(a) provides that "[a] person commits an offense if he unlawfully removes himself from official de-

---

6. *Commonwealth v. Grazier,* 552 Pa. 9, 713 A.2d 81 (1998).

7. Appellant's Pa.R.A.P.1925(b) statement was not docketed until October 2, 2006; however, Appellant's proof of service indicates the statement was handed to prison authorities on September 27, 2006, and therefore, under the prisoner mailbox rule, the statement is deemed to have been timely filed on that date. *See Commonwealth v. Patterson,* 931 A.2d 710 (Pa.Super.2007) (discussing the prisoner mailbox rule).

tention or fails to return to official detention following temporary leave granted for a specific purpose or limited period." 18 Pa.C.S.A. § 5121(e) defines "official detention," in relevant part, as follows: "As used in this section, the phrase "official detention" means arrest, detention in any facility for custody of persons under charge or conviction of crime...."

¶ 8 Regarding the crime of conspiracy, this Court has recently stated:

To convict of criminal conspiracy, the evidence must establish that the defendant entered an agreement with another person to commit or aid in the commission of an unlawful act, that the conspirators acted with a shared criminal intent, and that an overt act was done in furtherance of the conspiracy. 18 Pa. C.S.A. § 903. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. An agreement sufficient to establish a conspiracy can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode.

Once a conspiracy is established, the actions of each coconspirator may be imputed to the other conspirators. In this regard, [t]he law in Pennsylvania is settled that each conspirator is criminally responsible for the actions of his co-conspirator, provided that the actions are accomplished in furtherance of the common design.

*Commonwealth v. Geiger,* 944 A.2d 85, 90–91 (Pa.Super.2008) (citations, quotation marks, and quotations omitted).

¶ 9 In the case *sub judice,* we conclude the evidence was sufficient to sustain Appellant's conviction for conspiracy to commit escape. In this regard, we rely on the following well-reasoned analysis, which was presented in the trial court opinion:

The evidence of record clearly indicates that the appellant and his accomplices possessed the collective intent to assist in Brown's escape from custody from Family Court, with each named co-defendant taking an active role. Following Brown's incarceration for the numerous crimes against [the victim], Brown and the appellant conspired, using codes, to effectuate Brown's escape. (N.T. 9/20/04, pgs. 223–272; 9/20/04, pgs. 245–246, 248, 250–252). During [Brown's] incarceration, the appellant visited Brown on numerous occasions, including the day before the attempted escape. (N.T. 9/15/04, pgs. 31–32, 36, 51–52).

During their multiple visits, Brown and the appellant talked in "code" about the plan to commit the crime of escape by freeing Brown from custody at gunpoint while leaving Family Court. Daniel Olsten testified that Brown and the appellant used a code called the "Supreme Alphabet" to discuss the escape plan. (N.T. 9/20/04, pgs. 223–272). George Corbiscello also testified as an expert on the Five–Percent Nation and its communications-both oral and written. (*See generally* N.T. 9/21/04, pgs. 113–155). The evidence of a shared plan to commit a crime and the overt acts which substantiated that the plan had reached the action stage that was presented to the jury was more than sufficient to determine that the appellant and his co-defendants conspired to plan Brown's escape from custody.

Both experts translated conversations between Brown and the appellant. The appellant agreed to ensure that a car was present on 18th Street and that men

would be present with guns as Brown was leaving Family Court. (N.T. 9/14/04, pgs. 196–197). The plan called for these men to confront the sheriffs, secure Brown's person and escape in the car heading North. *Id.* The evidence further proved that the plan was executed albeit unsuccessfully. (N.T. 9/14/04, pgs. 196–197).

Trial Court Opinion filed 9/13/07 at 10–11.

¶ 10 We specifically find unavailing Appellant's following arguments regarding the sufficiency of the evidence: (1) Two conversations between Appellant and Brown revealed that Appellant was scared and he told Brown he would not help him escape, or in the alternative, the conversations revealed Appellant had withdrawn from the conspiracy; (2) Daniel Olson's and George Corbiscello's testimony was unreliable; (3) the Commonwealth had two inconsistent theories; and (4) Appellant was not present at the Family Courthouse on July 2, 2001 and his activities consisted of merely "prep work."

¶ 11 We have reviewed the two conversations to which Appellant refers and, while Appellant informed Brown it was not going to be easy to effectuate an escape because there would be many police and court personnel around and Appellant was concerned, the conversations also reveal that Appellant indicated he had been scoping out the scene and that it had to be done right. There was no indication that Appellant informed Brown that he was not going to participate in the escape or that he was withdrawing from the conspiracy. *See* N.T. 9/20/04 at 246–251, 268–272.

¶ 12 To the extent Appellant contends Daniel Olson's and George Corbiscello's translations of Appellant's and Brown's conversations was unreliable, thereby rendering the evidence insufficient, we conclude that the trier of fact was free to believe all, part, or none of the evidence regarding their translations. *See Commonwealth v. Hopkins,* 747 A.2d 910 (Pa.Super.2000).

¶ 13 We further find unavailing Appellant's contention that the evidence was insufficient since the Commonwealth submitted that the same evidence supported the crime of conspiracy to commit escape and the crime of conspiracy to intimidate the victim. We conclude that the Commonwealth's theories were not mutually exclusive, and in any event, since Appellant was convicted of only conspiracy to commit escape it is irrelevant whether the evidence was insufficient to support a conviction for conspiracy to intimidate a victim.

¶ 14 Finally, regarding the sufficiency of the evidence, we find no merit to Appellant's contention that he had to be present during the time Brown intended to escape in order to be convicted of conspiracy to commit escape. This Court has held that "[i]t is well settled that a co-conspirator not present at the execution of the crime is not relieved of liability." *Commonwealth v. Calloway,* 313 Pa.Super. 173, 459 A.2d 795, 797 (1983) (citations omitted).

¶ 15 Appellant's next claim is that the trial court erred in failing to find the Commonwealth improperly used its challenges to strike African–American women from the jury in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Appellant specifically avers the trial court erred in concluding there was no case of discrimination since four African–American women were selected as jurors.[8]

---

8. Appellant also claims on appeal that, in determining whether the Commonwealth violated *Batson,* the trial court should not have

considered the fact the defense purposefully engaged in discrimination by striking Caucasians. Here, after reviewing on the record

To establish any merit to a *Batson* claim, Appellant must establish a *prima facie* case of improper use of peremptory challenges. To do so, a defendant must establish that:

(1) the defendant is a member of a cognizable racial group and the prosecutor exercised peremptory challenges to remove members of the defendant's race from the venire; (2) the defendant can rely on the fact that the use of peremptory challenges permits "those to discriminate who are [of] a mind to discriminate"; and, (3) the defendant, through facts and circumstances, must raise an inference that the prosecutor excluded members of the venire on account of their race. The third prong requires defendant to make a record specifically identifying the race of all the venirepersons removed by the prosecution, the race of the jurors who served and the race of the jurors acceptable to the Commonwealth who were stricken by the defense. After such a record is established, the trial court must consider the totality of the circumstances to determine whether challenges were used to exclude venirepersons on account of their race. If the trial court finds in the affirmative, it may then require the prosecutor to explain his or her reasons for the challenge. Once the defendant makes a *prima facie* showing, the burden shifts to the Commonwealth to come forward with a neutral explanation for challenging [African–American female] jurors.

*Commonwealth v. Washington*, 592 Pa. 698, 738, 927 A.2d 586, 609–10 (2007) (quotation and citation omitted).[9] *See Johnson v. California*, 545 U.S. 162, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005) (holding the defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred). We note that "[t]he striking of a number of individuals belonging to some cognizable minority group, however, is not dispositive that a violation of *Batson* has occurred." *Commonwealth v. Hill*, 727 A.2d 578, 582 (Pa.Super.1999) (citations omitted).

¶ 16 In its Pa.R.A.P.1925(a) opinion, the trial court explained the reasons it denied Appellant's *Batson* challenge:

Following the selection of ten (10) jurors, the defense raised a *Batson* violation. After a full review, the claim was denied. (N.T. 9/10/04, pgs. 165–166). The Commonwealth did strike eight (8) African–American females during the *voir dire* process and provided a race neutral basis for each strike.[10] (N.T.

the parties' strikes and the selection of jurors, the trial court stated, "Now, I understand that there [are] what would appear to be patterns by both the Defense and the Commonwealth. So if you want to take a minute to look at the information you have just been provided and then let me know how you wish to proceed." N.T. 9/10/04 at 165. Defense counsel responded by arguing the Commonwealth was improperly striking African–American women and it was irrelevant that the Commonwealth had agreed to the selection of four African–American women. N.T. 9/10/04 at 165–168. Counsel did not object on the basis the trial court erred in considering whether the defense had also engaged in a discriminatory practice, and therefore, an objection on this basis is waived on appeal. Pa.R.A.P. 302.

9. *Batson* has been extended to cases alleging gender discrimination and has been held to apply in opposite race cases. *See generally Commonwealth v. Rico*, 551 Pa. 526, 711 A.2d 990 (1998) (Flaherty, J., plurality).

10. As Appellant admits, a portion of the discussion regarding Appellant's *Batson* claim apparently occurred "off the record." N.T. 9/10/04 at 162. In fact, the initial basis of Appellant's objection and the Commonwealth's response thereto is not included in the certified record. The certified record

9/10/04, pgs. 162–164). The Commonwealth's position was further supported by the fact that of the ten jurors chosen, four (4) were African–American females. These four were the dominant race and gender of the panel. N.T. 9/10/04, pgs. 165–166. Given that African–American females comprised the majority group of the panel and each strike exercised by the Commonwealth was race neutral, the appellant has no viable claim of purposeful discrimination.

Trial Court Opinion filed 9/13/07 at 6 (footnote and citation omitted).

¶ 17 We find no abuse of discretion in this regard, and therefore, we find no relief is due.

■ ¶ 18 Appellant's next claim is that the trial court improperly limited his cross-examination of Commonwealth expert witness George Corbiscello.

¶ 19 Here, after eliciting a summary of his qualifications, the Commonwealth offered Mr. Corbiscello as an expert witness on the Five–Percent organization and the "translation" of speech using the Supreme Alphabet and Supreme Mathematics. Before ruling whether Mr. Corbiscello would be accepted as an expert, the trial court permitted defense counsel to cross-examine Mr. Corbiscello on his qualifications as an expert. Appellant challenges the following portions of Mr. Corbiscello's cross-examination:

[**Cross-examination on qualification as expert**]:

[Mr. Corbiscello]: That is what we consider the Five–Percent Nation of Islam, sir.

[Defense Counsel]: That is what New Jersey considers them?

[Mr. Corbiscello]: Yes, sir.

[Defense Counsel]: Are you familiar with the Federal Court case of Mary versus Brodus, in which a Federal Court says that—

[District Attorney]: Objection.

[Defense Counsel]:—at least as New York is concerned is not—

THE COURT: When you hear objection, you need to terminate the question. And you don't need to yell, because you know I heard you the first time. And the objection is sustained.

\* \* \*

[Defense Counsel]: All right. Now, let's go back to where you gleaned your information about from Five–Percenters in the prison.

You indicated that sometimes you run across certain materials.

[Mr. Corbiscello]: Is that a question?

[Defense Counsel]: You run across materials, Five–Percent materials in the prison?

[Mr. Corbiscello]: Documents, yes, sir.

[Defense Counsel]: Excuse me?

[Mr. Corbiscello]: Documents, yes, sir.

[Defense Counsel]: Documents. What type of documents?

THE COURT: Wait a minute. Hold on. That doesn't go to expertise. Let's narrow the questions to expertise.

\* \* \*

[Defense Counsel]: Have you ever spoken to any Five–Percenters that were not in prison?

[Mr. Corbiscello]: I have spoken to Five–Percenters in the street, yes, sir.

contains nothing more than the trial court identifying the race and gender of the potential jurors who were struck by the parties and defense counsel's assertion that, while the

Commonwealth accepted four African–American women, the Commonwealth used all of its challenges to remove African–American women. N.T. 9/10/04 at 162–168.

[Defense Counsel]: Have you spoken to any Five–Percenters that were members of the professions, such as the legal profession or medical profession?

[District Attorney]: Objection to relevance.

THE COURT: Sustained.

[Defense Counsel]: Would you say that you have knowledge about the Five–Percenters or members of the Five–Percent organization who are not in prison or is your education only limited to Five–Percenters inside of prison?

[District Attorney]: Objection.

THE COURT: Sustained.

N.T. 9/21/04 at 105–106, 107–108, 111.

¶ 20 After Mr. Corbiscello was accepted as an expert, and following direct examination, the following occurred during cross-examination by Appellant's trial counsel:

[Defense Counsel]: Mr. Corbiscello, you indicated that you were familiar with the founder of the Five–Percent [group] as Lawrence 13X.

[Mr. Corbiscello]: Yes, sir.

[Defense Counsel]: Did you know that he was instrumental in quelling of the riots after Martin Luther King was killed?

[Mr. Corbiscello]: Oh, yes, sir.

[Defense Counsel]: Okay. And did you know that when he died in 1969 Mayor Lindsey actually attended his funeral?

[Mr. Corbiscello]: They used to call him Mayor Lindsey's shadow.

[Defense Counsel]: I believe you indicated when we did your voir dire that you were familiar with the Five–Percent School that is in New York?

[Mr. Corbiscello]: Yes, sir.

[Defense Counsel]: Have you ever visited that school?

[Mr. Corbiscello]: No, sir, I have not.

[Defense Counsel]: You do know that it enjoys a not for profit tax status in New York?

[District Attorney]: Objection to relevance, Your Honor.

THE COURT: Sustained.

[Defense Counsel]: Did you know that that particular school has after school tutoring for children and substance abuse programs?

[District Attorney]: Objection to the relevance.

THE COURT: Sustained.

[Defense Counsel]: Do you know of any famous individuals, such as Erika Baydu, is a member of the Five–Percent [group]?

[District Attorney]: Objection.

THE COURT: Sustained.

N.T. 9/21/04 at 171–172.

¶ 21 Appellant contends counsel's questions were relevant in that the questions demonstrated Mr. Cobiscello's limited knowledge and biased view in that Mr. Cobiscello interviewed/studied only members of the Five–Percent organization who were in prison. Appellant contends that "[w]hen someone claims to be an expert of another group of people their knowledge and opinion should certainly be viewed with caution if all of there (*sic*) knowledge came from prisoners." Appellant's Brief at 14–15.

■ ¶ 22 It is well settled that "[t]he test to be applied when qualifying an expert witness is whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation." *Commonwealth v. Malseed*, 847 A.2d 112, 114 (Pa.Super.2004) (citation omitted). Such knowledge need not be obtained through formal education but may have been acquired by other training or experience. *Commonwealth v. Conklin*, 587 Pa. 140, 897 A.2d 1168 (2006). More-

over, "[a] defendant's right of confrontation includes the right to cross-examine witnesses about possible motives to testify. However, a witness may not be contradicted on 'collateral' matters, ... and a collateral matter is one which has no relationship to the case at trial." *Commonwealth v. Guilford,* 861 A.2d 365, 369 (Pa.Super.2004) (quotations and quotation marks omitted). "The scope of cross-examination is a matter within the discretion of the trial court and will not be reversed absent an abuse of that discretion." *Commonwealth v. Chmiel,* 585 Pa. 547, 592, 889 A.2d 501, 527 (2005) (quotation and quotation marks omitted).

¶ 23 In the case *sub judice,* regarding the trial court limiting defense counsel's cross-examination of Mr. Cobiscello in determining whether Mr. Cobiscello should be qualified as an expert, we find no abuse of discretion. The trial court determined that the questions, which Appellant now challenges on appeal, were irrelevant to the issue of whether Mr. Cobiscello should be qualified as an expert. That is, the trial court determined that, while Mr. Cobiscello's knowledge of a federal court case, his conclusions from reviewing documents, and whether Mr. Cobiscello spoke to any non-prison Five–Percent members may have related to the weight to be given to Mr. Cobiscello's testimony, such questions were not relevant in determining whether Mr. Cobiscello should be qualified as an expert.

¶ 24 Moreover, we note that, after Mr. Cobiscello was deemed to be an expert, the trial court specifically informed Appellant, out of the jury's presence, of the following regarding the upcoming cross-examination of Mr. Cobiscello:

THE COURT: Number two, Corbiscello is an expert. There may be limitations on his credentials. Those limitations may affect whether the jury decides to accept his testimony or to give it the weight that the Commonwealth would like it to receive.

You are perfectly permitted to attack the fact that he's never worked in a Pennsylvania prison. Doesn't make him not an expert. It determines whether his testimony is relevant in this case. It does not preclude him from being an expert.

\* \* \*

But the basis of his opinion is perfectly attackable on cross.

In other words, this experience that you have gained, and you have told us that in your experience in New Jersey these words mean one, two, three. Have you ever worked in a Pennsylvania prison? Have you ever worked with Pennsylvania Five–Percenters? ... But it doesn't undermine the fact that he is an expert.

\* \* \*

You can ask him if he's ever met a lawyer who was a Five–Percenter. You can ask him.

N.T. 9/21/04 at 126–129.

¶ 25 As such, it is clear that the trial court informed Appellant that the areas of cross-examination on qualifications which the trial court deemed to be inappropriate would be appropriate while Mr. Corbiscello was testifying as an expert witness on cross-examination.

¶ 26 In addition, we find no abuse of discretion with regard to the trial court sustaining the district attorney's objections, which were made while Mr. Corbiscello was testifying as an expert witness on cross-examination. Whether the Five–Percent school had a not for profit tax status, whether the school tutored children and had substance abuse programs, and

whether any of the Five–Percent members were "famous individuals" was clearly collateral with no relationship to the conspiracy charge before the jury. Therefore, the trial court properly sustained the district attorney's objections.

■ ¶ 27 Appellant's next claim is that he had a constitutional right to be indicted by a grand jury. Specifically, Appellant contends Article I, Section 10 of the Pennsylvania Constitution demands criminal proceedings be initiated by a grand jury, unless Appellant voluntarily waives this right. While he concedes Article I, Section 10 has been amended to allow criminal proceedings to be initiated without a grand jury indictment, he contends such amendment is unconstitutional. Finally, he suggests that the trial court did not have subject matter jurisdiction since the criminal proceedings were initiated by a criminal information instead of a grand jury indictment.

¶ 28 Initially, we note that "our standard of review when considering [an] appellant's constitutional challenges is plenary, as these challenges involve pure questions of law." *Commonwealth v. Leddington*, 908 A.2d 328, 331 (Pa.Super.2006) (citation omitted).

¶ 29 As indicated, Appellant concedes that Article I, Section 10 has been amended to permit criminal proceedings to be initiated without a grand jury indictment.

To the extent he argues the amendment is unconstitutional, the argument has been considered, and rejected, by the Pennsylvania Supreme Court. *Commonwealth v. Webster*, 462 Pa. 125, 337 A.2d 914 (1975). The Supreme Court has specifically stated:

> [Appellant] is foreclosed from contending that [A]rticle I, [S]ection 10 violates any rights guaranteed by the Pennsylvania Constitution. Because permission to substitute informations for indictments is granted by the amended Constitution, any other provision of the Constitution that heretofore would have prohibited initiation of criminal proceedings in the manner permitted by [A]rticle I, [S]ection 10 is *pro tanto* modified to permit it.

*Id.* at 916. Since the Supreme Court has concluded the amendment to Article I, Section 10 is constitutionally firm under the Pennsylvania Constitution, we find Appellant's contention to be meritless. We further find meritless Appellant's contention that the trial court did not have subject matter jurisdiction, since such argument is premised upon Appellant's meritless constitutional claim.[11]

■ ¶ 30 Appellant's final claim is that his sentence was illegal in violation of *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).[12] Specifically, he contends that, in imposing sentence, the trial court relied on various "facts," which were not found by the jury.[13]

11. To the extent Appellant challenges the process through which Article I, Section 10 was amended, we conclude the argument is not adequately developed to permit us to properly address the merits of the claim. Appellant cites the preamble to Article I of the Pennsylvania Constitution, portions of Article I, Section 25 of the Pennsylvania Constitution, and Alexander Hamilton's Federalist No. 78 in support of his position. However, we conclude Appellant has failed to explain the manner in which these authorities are relevant to the process in which Article I, Section 10 was amended, and therefore, we reject his claim.

12. With regard to legality of sentencing issues, our standard of review is *de novo* and our scope of review is plenary. *See Commonwealth v. Yuhasz*, 592 Pa. 120, 923 A.2d 1111 (2007).

13. The "facts" to which Appellant refers includes: (1) Appellant was a principal planner of the crime; (2) Appellant was the chief lieutenant responsible for executing the plan, making sure that it happened, rounding up the soldiers, and getting it done; (3) Appellant had absolute indifference to the value of human life; (4) There were two other semiauto-

He concludes that his sentence of three and one-half years to seven years in prison, which is within the statutory maximum but exceeds the aggravated range of the sentencing guidelines, violates the Sixth Amendment under the United State Supreme Court's decision in *Blakely.*

In *Blakely,* the Supreme Court held that the Sixth Amendment was violated by Washington State's determinate sentencing scheme whereby a sentencing court could impose an "exceptional" sentence, above the standard-range statutory maximum, only after making a finding of substantial and compelling reasons justifying an exceptional sentence. Further, reasons which justify exceptional sentences can only be factors other than those which are used in computing the standard range sentence for the offense. In *Blakely,* the sentencing court departed upward from a standard range sentence for second-degree kidnapping based on its finding that the defendant acted with deliberate cruelty.

*Commonwealth v. Bromley,* 862 A.2d 598, 601–602 (Pa.Super.2004) (citations, quotation marks, quotations, and footnote omitted).

¶ 31 However, this Court has held that *Blakely* does not implicate the "Pennsylvania [indeterminate] scheme, where there is no promise of a specific sentence." *Commonwealth v. Rossetti,* 863 A.2d 1185, 1193 (Pa.Super.2004) (quotation and quotation marks omitted). "As a general matter,

Pennsylvania's sentencing scheme, with its guidelines and suggested minimum sentences, is 'indeterminate, advisory, and guided' in its nature." *Commonwealth v. Gordon,* —— Pa. ——, 942 A.2d 174, 182 (2007) (quotation omitted). Therefore, in Pennsylvania, where a sentence is within the statutory maximum but exceeds the aggravated range of the sentencing guidelines, the Sixth Amendment as discussed in *Blakely* is not violated since a trial court's reliance upon materials not admitted in an appellant's trial may be used to depart from the guidelines.[14] *See Commonwealth v. Yuhasz,* 592 Pa. 120, 923 A.2d 1111 (2007) (following negotiated guilty plea trial court sentenced the defendant within the statutory maximum but exceeded the guideline's aggravated range; sentence did not violate *Blakely* even though the trial court relied upon material not admitted in the defendant's guilty plea). Simply put, where the statutory maximum is not exceeded, a trial court's reliance upon facts not admitted at trial in departing from the sentencing guidelines is "constitutionally irrelevant." *Id.* at 134, 923 A.2d at 1119. Therefore, we find no merit to Appellant's claim.

¶ 32 Affirmed.

---

matic guns at the scene; (5) It is extraordinary to believe that you could formulate in your mind a plan to take guns down to the courthouse, which is populated with babies; (6) I think the reckless indifference to the value of human life, the cold bloodedness of the plan, and the complete disregard for society warrants an aggravated sentence; and (7) Escape as it is theoretically conceived of in our crimes code doesn't even begin to con-

template what [Appellant] and Mr. Brown "cooked up" with Brian Prout.

**14.** In the case *sub judice,* we find it unnecessary to determine whether the "facts" to which Appellant refers were established during Appellant's trial, and therefore considered by the jury, or whether the trial court judge made the findings of fact following review of material presented for the first time during sentencing.