J-A15007-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| v. | : | |
| | : | |
| ROLAND YUNIOR PENA | : | |
| | : | |
| Appellant | : | No. 789 MDA 2023 |

Appeal from the Judgment of Sentence Entered April 17, 2023
In the Court of Common Pleas of Berks County Criminal Division at
No(s):  CP-06-CR-0002368-2021

BEFORE:   DUBOW, J., BECK, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY DUBOW, J.:                    **FILED: AUGUST 8, 2024**

Appellant Roland Yunior Pena appeals from the April 17, 2023 judgment of sentence entered by the Berks County Court of Common Pleas imposing a sentence of life in prison without parole following his conviction of First-Degree Murder and related charges.  Appellant challenges the court's jury instructions, the admission of officers' testimony, and the denial of a suppression motion. After careful review, we affirm the judgment of sentence.

The following are the relevant facts and procedural history.  In the early morning hours of April 25, 2021, Appellant and Walner Torres-Santana ("Decedent") interacted over Facebook Messenger, which led to Appellant arriving at Decedent's home at 354 Pear Street in Reading before 5:30 A.M.

_____

[*] Former Justice specially assigned to the Superior Court.

Mr. Rony Tineo was with Decedent at the time and saw Decedent receive a call from Appellant, noting Appellant's name on Decedent's phone screen.

Mr. Tineo testified that Decedent subsequently went outside his apartment to meet Appellant, even though Mr. Tineo advised Decedent not to go because Mr. Tineo knew Appellant carried a firearm. After hearing Appellant and Decedent arguing for several minutes, Mr. Tineo heard a third person, whom he identified by voice as "Yo-Yo," say "Roland, no, no, no, no," followed by three gunshots. N.T. Trial, 3/27-31/2023, at 254-55.

After the shooting, Mr. Tineo found Decedent alone on the ground outside the residence and requested that neighbors call 911. Emergency personal responded to a call placed at 5:33 A.M. and transported Decedent to the hospital, where he died. Later that day, Mr. Tineo called Appellant and accused him of the murder, which Appellant denied. *Id.* at 260-61.

Police recovered a cellphone from Decedent's person, which revealed multiple calls and messages between Appellant and Decedent prior to a final call at 5:24 A.M. Decedent's phone additionally had in its camera roll a "selfie" of Appellant wearing a light-colored Adidas shirt, which was "captured" at 4:44 A.M. on the day of the murder. *Id.* at 336. The selfie included the following caption: "Por Violar Códigos Esque Los Voy Aromper Alos Dos!" Com. Ex. 20.

Criminal Investigator Steve Valdez translated the caption as: "For violating the code I'm going to fight them both." N.T. Trial at 355.[1]

Officers recovered surveillance video from the area around Decedent's 354 Pear Street home, which depicted four men confronting Decedent and one of them shooting Decedent. One of the men wore a shirt similar to that worn by Appellant in the selfie. Mr. Tineo identified Appellant in the video as one of the four men. At trial, Mr. Tineo also identified two of the other men in the video as "Yo-Yo" and "Chainy." *Id.* at 294. Mr. Tineo did not identify the shooter from the video footage. As noted, however, he described hearing Yo-Yo say "Roland, no, no, no, no," followed by the gunshots. *Id.* at 254-55.

On April 29, 2021, law enforcement officers arrested Appellant at JFK International Airport with a one-way ticket to the Dominican Republic and possessing three cellphones. Officers sought and received warrants to search the phones and a search warrant for Appellant's home at 704 Schuylkill Avenue. Relevantly, officers recovered a digital video recorder ("DVR"), which was connected to security cameras outside of Appellant's home, and subsequently obtained a warrant to search the DVR.

The DVR revealed video showing Appellant and three other men leaving Appellant's home immediately prior to the murder and returning after it. Other surveillance video from the 700 block of Schuylkill Avenue showed men

---

[1] Investigator Valdez testified that he was born in the Dominican Republic and had spoken Spanish and English all his life but was not trained as an interpreter. *Id.* at 354, 363.

at 5:18 A.M. entering an SUV which resembled a vehicle also seen in the Pear Street surveillance video, which was similar to a Honda CRV owned by Appellant.

On February 14, 2022, Appellant filed an Omnibus Pretrial Motion seeking to suppress evidence derived from the warrants for his cellphones and his residence. On March 15, 2022, the court held a hearing on the motion and denied suppression on June 16, 2022.

The trial court presided over a jury trial from March 27-31, 2023. On March 31, 2023, the jury convicted Appellant of First-Degree Murder and related offenses. On April 17, 2023, the court imposed a sentence of life imprisonment without parole for First Degree Murder[2] and a concurrent aggregate sentence of 20-40 years of imprisonment for the related crimes.

On April 26, 2023, Appellant filed a post-sentence motion, which the trial court denied.[3] On May 31, 2023, Appellant filed a notice of appeal, after which Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following issues on appeal:

A. Did not the lower court err and abuse its discretion in instructing the jury on flight, over objection, where there was no

---

[2] 18 Pa.C.S. §§ 2502(a).

[3] The docket designated May 2, 2023, as the date Appellant filed his post-sentence motion, prompting this Court to issue a Rule to Show Cause as to why the appeal should not be dismissed as untimely. Appellant and the trial court, however, demonstrated that the docket entry was erroneous and that Appellant timely filed his post-sentence motion on April 26, 2023, which the trial court dismissed on May 2, 2023.

evidence from which a reasonable juror could have inferred that [Appellant] knew he was wanted by police?

B. Did not the lower court err and abuse its discretion in permitting, over objection, a police officer to function as a language interpreter?

C. Did not the lower court err and abuse its discretion in permitting, over objection, a police officer to testify to prejudicial technical evidence, and the significance of that evidence, without being qualified as an expert?

D. Did not the lower court err and abuse its discretion in denying the defense motion to suppress data extracted from cellphone[s] found in [Appellant's] possession and the evidence seized from his home.

Appellant's Br. at 5.

## A.

In his first issue, Appellant claims that the trial court abused its discretion in instructing the jury on flight, over his objection.[4] "We review a challenge to a jury instruction for an abuse of discretion or an error of law."

_____

[4] The court provided the following instruction:

Generally speaking, when a crime has been committed and a person thinks he is or may be accused of committing it and he flees or conceals himself or herself, such flight or concealment is a circumstance tending to prove the person is conscious of guilt. Such flight or concealment does not necessarily show consciousness of guilt in every case.

A person may flee or hide for some other motive and may do so even though innocent. Whether the evidence of flight or concealment in this case should be looked at as tending to prove guilt depends upon the facts and circumstances of this case and especially upon motives that may have prompted the flight or concealment. You may not find the defendant guilty solely on the basis of evidence of flight or concealment.

N.T. Trial at 638.

*Commonwealth v. Rush*, 162 A.3d 530, 540 (Pa. Super. 2017). It is well established that "trial courts are invested with broad discretion in crafting jury instructions, and such instructions will be upheld so long as they clearly and accurately present the law to the jury for its consideration." *Id.* (citations omitted). "A jury charge is erroneous if the charge as a whole is inadequate, unclear, or has a tendency to mislead or confuse the jury rather than clarify a material issue." *Id.*

An instruction on flight is called for where "a person has reason to know he is wanted in connection with a crime, and proceeds to flee or conceal himself from the law enforcement authorities[.]" *Commonwealth v. Thoeun Tha*, 64 A.3d 704, 714 (Pa. Super. 2013) (citation omitted). "A defendant's knowledge may be inferred from the circumstances attendant to his flight." *Id.* (citation and internal alteration omitted).

Appellant argues that the instruction was erroneous in the instant case because the Commonwealth did not show that he knew he was wanted by police, as he had not been publicly identified as a suspect. Appellant's Br. at 31-36. Addressing his arrest at JFK Airport, Appellant presented his mother who testified that Appellant was traveling to the Dominican Republic to visit her in the hospital following complications from abdominal surgery. *Id.* at 34-35. Thus, he argues that the Commonwealth's evidence showed only that he left the scene of the crime, which he asserts is insufficient to justify a flight instruction. *Id.* at 31.

- 6 -

After review, we conclude that the trial court properly instructed on flight given Appellant's attempt "to travel on a one-way ticket to the Dominican Republic" days after the murder.  Trial Ct. Op. at 14.  Additionally, Mr. Tineo testified that he called and accused Appellant of the murder.  N.T. Trial at 260-61.  The fact that Appellant presented another justification for his travel does not mean that the trial court abused its discretion in providing the flight instruction.  Accordingly, this issue warrants no relief.

## B.

In his second issue, Appellant argues that the trial court erred in overruling his objection to Investigator Valdez's lay testimony translating the selfie caption and the series of approximately twenty short text messages exchanged between Appellant and Decedent, including some involving slang, when Investigator Valdez was not a trained interpreter.[5]  Appellant's Br. at 37-43.

We review a trial court's ruling on the admissibility of testimonial evidence for abuse of discretion.  *See Commonwealth v. Randall*, 758 A.2d 669, 679 (Pa. Super. 2000).  "An abuse of discretion is not merely an error of

_____

[5] For example, a text from Decedent to Appellant stated: "Vamos a medirte el aceite . . ." which Investigator Valdez translated to "let's measure the oil" and explained as "[let's] measure your toughness."  N.T. Trial at 356-57 (translating Com. Ex. 19).  Appellant disputed the Investigator's translation of another text from Appellant to Decedent stating, "Cállate Bocón[.]"  The Investigator translated the first word as "shut up" and the second as "big mouth."  *Id.* at 358.  In contrast, Appellant testified that "people like [Decedent] and I" use the word "bocón" to mean "bro" or "brother[.]"  *Id.* at 567.

judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." ***Commonwealth v. Radecki***, 180 A.3d 441, 451 (Pa. Super. 2018) (citation omitted).

Pennsylvania's Rules of Evidence address lay and expert testimony in Rules 701 and 702. Together, the Rules "preclude[] lay witness opinion testimony based upon scientific, technical, or other specialized knowledge that falls within the realm of expert opinion testimony[.]" ***Commonwealth v. Jones***, 240 A.3d 881, 889 (Pa. 2020); ***see also*** Pa.R.E. 701 (providing, *inter alia*, that lay opinion testimony is limited to that which is: "(a) rationally based on the witness's perception"); Pa.R.E. 702 (explaining that the expert's "specialized knowledge is beyond that possessed by the average layperson" and "will help the trier of fact to understand the evidence or to determine a fact in issue").

In qualifying an expert witness, a court should consider "whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation. Such knowledge need not be obtained through formal education but may have been acquired by other training or experience." ***Commonwealth v. Saunders***, 946 A.2d 776, 785 (Pa. Super. 2008) (internal citation and quotation marks omitted).

In ***Commonwealth v. Rose***, this Court applied Rules 701 and 702 and held inadmissible a law enforcement officer's testimony "as a lay witness

regarding the meaning of street language" in prison phone calls. 172 A.3d 1121, 1130-31 (Pa. Super. 2017). The Court concluded that "[w]hen an officer is not qualified as an expert, the officer's lay opinion [regarding the meaning of street language] is admissible only when the law enforcement officer is a participant in the conversation, has personal knowledge of the facts being related in the conversation, or observed the conversations as they occurred." *Id.* at 1131 (citation and internal quotation marks omitted).

In the instant case, Appellant argues that Investigator Valdez's translation violated his "constitutional rights to due process and a fair trial" because the Investigator was a lay prosecution witness rather than an impartial expert. Appellant's Br. at 41-43. In light of this Court's holding in *Rose*, we agree with Appellant that the trial court erred in overruling his objection to Investigator Valdez's translation of the selfie caption and text messages without formally qualifying Investigator Valdez as an expert.

It is indisputable that the translation of the caption and text messages involved "specialized knowledge [that] is beyond that possessed by the average layperson" who does not speak Spanish. Pa.R.E. 702. As in *Rose*, Investigator Valdez could not testify as a layperson as he was not "a participant in the conversation" such that he could convey to the jury his "sensory and experiential observations" regarding the conversation." *Rose*, 172 A.3d at 1130-31. Accordingly, we conclude that the trial court abused its

discretion in admitting Investigator Valdez's testimony without formally qualifying him as an expert.[6]

\*

We consider, however, whether the court's failure to formally qualify Investigator Valdez as an expert was harmless, as a "defendant is entitled to a fair trial but not a perfect one." **In the Interest of J.M.G.**, 229 A.3d 571, 581 (Pa. 2020) (citation and internal alteration omitted). An appellate court may engage in a harmless error analysis *sua sponte* and may direct supplemental briefing "to enhance fairness." **Commonwealth v. Hamlett**, 234 A.3d 486, 492-94 (Pa. 2020). We find no need for additional briefing as Appellant addressed harmless error in his initial brief to this Court. Appellant's Br. at 42-43.

A court may find an error harmless so long as there is no "reasonable possibility that an error might have contributed to the conviction." **J.M.G.**, 229 A.3d at 580 (citation and internal quotation marks omitted). The Supreme Court has identified three types of harmless error:

> Harmless error exists if the record demonstrates either: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely

---

[6] Appellant additionally argues that Investigator Valdez's testimony violated the statutory provision governing the appointment of interpreters, 42 Pa.C.S. § 4412. Appellant's Br. at 37-40. As we find that the court erred in admitting the testimony under the application of Rules 701 and 702 in **Rose**, we do not address this statutory issue. We observe, however, that Section 4412 addresses the translation of ongoing court proceedings for parties and their immediate family members "with limited English proficiency," and does not address the translation of written evidence for the jury. 42 Pa.C.S. § 4412.

cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

**Commonwealth v. Hairston**, 84 A.3d 657, 671–72 (Pa. 2014).

As noted, the "error" in this case was the trial court's failure to formally qualify Investigator Valdez as an expert before admitting his testimony translating the caption and text messages. After careful consideration, we conclude that the impact of the court's error on the conviction was *de minimis*. We have no doubt that the trial court would have qualified Investigator Valdez as an expert as the court noted that the Investigator was "born in the Dominican Republic and spoke both English and Spanish his entire life." Trial Ct. Op. at 15-16; **see also Saunders**, 946 A.2d at 785–786 (holding that an expert's specialized knowledge may be gained through experience as well as technical training). Accordingly, we conclude that the court's error in admitting Investigator Valdez's translation testimony without formally qualifying him as an expert was harmless.[7]

_____

[7] Moreover, we fail to see any prejudice resulting from the admission of Investigator Valdez's testimony because the Commonwealth provided Appellant with the investigator's translation of the text messages during discovery. Thus, we agree with the trial court that Appellant had "ample opportunity to obtain his own translation if he suspected that Investigator Valdez's translation was inaccurate." Trial Ct. Op. at 16. Indeed, two certified interpreters were present during the trial. Thus, the court's failure to formally qualify Investigator Valdez as an expert before admitting his testimony could not have contributed to the jury's verdict, where Appellant had the opportunity to challenge the translation.

- 11 -

**C.**

Appellant next asserts that the trial court erred in permitting Investigator Atkins to testify regarding the extraction report of Appellant's phone over Appellant's objection. Appellant's Br. at 44-50. Invoking Rules 701 and 702 again, Appellant contends that the trial court abused its discretion in allowing Investigator Atkins to testify regarding "highly technical evidence" in the extraction report "without requiring him to be qualified as an expert." Appellant's Br. at 29. As with the prior issue, we review the trial court's ruling on the admissibility of testimonial evidence for abuse of discretion. **Randall**, 758 A.2d at 679.

The extraction reports in this case provided detailed information regarding Appellant's phone, including "device events," such as when the phone's display screen was on, and location data. Investigator Atkins testified regarding the device events, which he correlated to time points in the video, such as when Appellant appears to be manipulating a lighted object consistent with a phone. N.T. Trial at 393-94. He also testified to location data, which placed the phone at Appellant's residence at 5:18 A.M. and again at 5:46 A.M. and in the 300 block of Pear Street between those times. **Id.** at 399-400. Appellant objected to this testimony, which he contends constituted "quintessential expert testimony" that was "improper and inadmissible." **Id.** at 386-89, 396-98; Appellant's Br. at 47-48.

The trial court overruled the objection based upon Appellant's prior stipulation regarding the extraction reports, which provided in relevant part as follows:

> Sophie Hiser [a Berks County Digital Forensic Examiner] is an expert in the field of forensic digital analysis. If called to testify, she would testify that she had successfully created an extraction report, documenting all electronic data stored in [Appellant's cellphones]. This data includes call logs, text messages, photographs and location information.

Com. Ex. 73, Stipulation of Fact #1, at ¶ 4.

After review, we conclude that the trial court did not abuse its discretion in overruling Appellant's objection. While expert testimony is generally needed to address evidence similar to the extraction report, Appellant's stipulation obviated that need in this case. Appellant forfeited his ability to challenge the report's technical aspects when he stipulated that Ms. Hiser "successfully created an extraction report, documenting all electronic data . . . include[ing] call logs, text messages, photographs and location information." *Id.* Given this stipulation, the trial court did not abuse its discretion in overruling Appellant's objection to Investigator Atkins' testimony regarding the same call logs, text messages, photographs, and location information. No relief is warranted on this issue.

**D.**

In his final issue, Appellant appeals the trial court's denial of his motion to suppress the cellphone data and DVR video. Appellant's Br. at 51-59. He

- 13 -

claims that the search warrants for the cellphones were overbroad and that the affidavit supporting the warrant for his home lacked probable cause.

"We review trial court suppression orders to determine whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. Barr*, 266 A.3d 25, 39 (Pa. 2021). While "[w]e are bound by the suppression court's factual findings so long as they are supported by the record[,]" we apply a *de novo* standard of review to questions of law. *Id.* (citation omitted). Our scope of review is limited to the suppression hearing record and includes "only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted[.]" *Commonwealth v. Green*, 265 A.3d 541, 550–51 (Pa. 2021) (citation omitted).

The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect against unreasonable searches and seizures and "require searches to be conducted pursuant to warrants, supported by probable cause, that describe with particularity the items sought[.]" *Commonwealth v. Young*, 287 A.3d 907, 919 (Pa. Super. 2022). Pennsylvania's particularity requirement has been interpreted more stringently than the federal provision, as it requires the warrant to describe the objects of the search "as nearly as may be" rather than the federal provision which demands merely that the warrant "particularly describ[e] the place to be searched, and the persons or things to be seized." PA. CONST. art. I, § 8; U.S. CONST. amend. IV. "The clear meaning of the language [in Section

- 14 -

8] is that a warrant must describe the items as specifically as is reasonably possible." **Commonwealth v. Ani**, 293 A.3d 704, 716 (Pa. Super. 2023) (citation omitted).

The particularity requirement "prohibits a warrant that is not particular enough and a warrant that is overbroad." **Young**, 287 A.3d at 919-20 (citations omitted). While distinct concepts, ambiguity and overbreadth "diagnose symptoms of the same disease: a warrant whose description does not describe as nearly as may be those items for which there is probable cause." **Ani**, 293 A.3d at 717 (citation omitted).

Thus, in addressing an overbreadth challenge, "the natural starting place . . . is to determine for what items probable cause existed." **Green**, 265 A.3d at 551. "In determining whether probable cause exists to support a search warrant, the issuing authority is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit there is a fair probability that contraband or evidence of a crime will be found in a particular place." **Id.** (citation, internal quotation marks, and alterations omitted).

Next, a court measures the "sufficiency of the description" in the warrant "against those items for which there was probable cause." **Id.** at 550 (citation omitted). "Any unreasonable discrepancy between the items for which there was probable cause to search and the description in the warrant requires suppression," as such "warrant is overbroad, ambiguous, or perhaps both." **Id**. (citation and alteration omitted) Nevertheless, courts have permitted

- 15 -

facially overbroad warrants to be cured by the narrower language of supporting affidavits "even if the affidavit is not expressly incorporated, if the authorities in fact confined their search to the scope of the affidavit rather that exerting the broader authority granted by the warrant itself." *Young*, 287 A.3d at 929.

The Supreme Court clarified that the above standard for an overbreadth challenge applies equally to warrants for physical searches as for searches of digital information on personal electronic devices, such as cellphones. *Green*, 265 A.3d at 553-54. Courts, however, have noted that digital evidence poses specific challenges as "digital evidence can be easily disguised or hidden." *Ani*, 293 A.3d at 722. "Thus, an officer executing a warrant to search digital evidence cannot determine whether the 'items' [for which probable cause exists] are present unless and until the device is thoroughly searched." *Id.* Moreover, while temporal limitations should be placed on search warrants for digital evidence where "reasonably possible," they are not required under our caselaw, especially in cases where "a temporal limitation makes little sense." *Id.* at 723.

\*

Appellant first challenges the warrants for his three cellphones as unconstitutionally overbroad. Appellant's Br. at 52-56. The warrants provided as follows:

> [T]he computer mobile device/cellular telephone facility including all user generated data stored on the handset, SIM card and/or MicroSD card, such as, but not limited to: phone ownership,

brand, make & model, serial number, IMEI (International Mobile Equipment Identity) cellular service/network provider or carrier information, user/owner account information, calendar events, contact lists, SMS (short message service) & MMS (Multimedia messaging service), call log details, e-mail accounts, internet web browsing activity, GPS (Global Positioning System) information, IP (Internet Protocol) Connections, user generated notes, user generated dictionaries, wireless network connections, sync files, voicemails, removable media storage cards (SD, microSD, etc...), SIM cards (Subscriber Identity Module), digital photographs, video files, audio files, purchased and deleted applications and their data, social networking data, all operating system files (database files), other electronic files, all deleted data.

Com. Ex. 3 at 2.[8]  A four-page affidavit was attached to the warrant, which provided detailed information about, *inter alia*, the murder; the text messages on Decedent's phone between Appellant and Decedent, as well as the captioned selfie; surveillance video of the shooting showing the eventual shooter wearing clothing similar to that in the selfie and using what appeared to be a phone, which the affiant connected to incoming calls on Decedent's cellphone; Mr. Tineo's account of the morning, his identification of Appellant in a photo and in the surveillance video, and his subsequent communications with Appellant; as well as Appellant's arrest at JFK Airport with three cellphones.  The affidavit sought "permission to search and seize evidence relating to Murder of the first degree[,]" while noting that the search "may require searching authorities to examine all stored data to determine which particular files are evidence or instrumentalities of crimes."  *Id.* at 5.

---

[8] The warrants and the attached affidavits of probable cause for the three cellphones seized from Appellant at JFK Airport are identical but for the physical description of each phone.  Com. Exs. 3, 4, 5 (Cellphone Warrants).  We solely reference Exhibit 3 for ease of citation.

While conceding that probable cause existed for some items, Appellant argues that the items for which the Commonwealth had probable cause are "dwarf[ed]" by the inclusion of items "unrelated to the alleged criminal activity[.]" Appellant's Br. at 55. Appellant emphasizes that the warrant lacks a temporal limitation and extends to "everything that could be found on a cellphone, regardless of its connection to the incident." *Id.*

We disagree as we find no "unreasonable discrepancy between the items for which there was probable cause to search and the description in the warrant." *Green*, 265 A.3d at 550 (citation and alteration omitted). The averments in the affidavit clearly tie Appellant to the murder and describe his use of a cellphone to communicate with Decedent prior to the shooting. Thus, there was "a fair probability" that evidence of the murder would be found on the phones. *Id.* at 551.

We reject Appellant's claim that the warrant required temporal limitation to the time of the murder. Rather, a temporal limitation was not reasonably possible where the Decedent and Appellant had a relationship before the murder and used their cellphones to interact. Moreover, as noted by the trial court, the warrants did not permit the Commonwealth to search and seize any evidence on his phone but only evidence related to First Degree Murder, a charge for which the affiant presented ample evidence of Appellant's criminal involvement. Accordingly, we agree with the trial court's that the warrant was not overbroad where "the description of the items to be searched for and

seized was as specific as reasonably possible[.]" Findings of Fact and Conclusions of Law, 6/16/22, at ¶¶ 51-53.

*

Appellant next challenges the search warrant for Appellant's residence as lacking probable cause and seeks suppression of the resulting surveillance video seized from the DVR. Appellant's Br. at 56-59. In support, Appellant relies upon the Supreme Court's reasoning that "probable cause to believe that a man has committed a crime on the street does not necessarily give rise to probable cause to search his home." **Id.** at 57-58 (quoting **Commonwealth v. Wallace**, 42 A.3d 1040, 1049-50 (Pa. 2012)). Appellant asserts that the affidavit in the instant case failed to show "'any nexus between Appellant's house' and the crime." **Id.** at 58 (quoting **Wallace**, 42 A.3d at 1050).

We disagree and instead agree with the trial court that the affidavit provided probable cause to search 704 Schuylkill Road for, *inter alia*, "any and all surveillance video recording devices." Com. Ex. 6 at 1. As set forth above in relation to the cellphone warrants, the affidavit for the residence detailed the facts of murder; communications between Appellant and Decedent; the Pear Street surveillance video; Mr. Tineo's information about Appellant's argument with Decedent and hearing Yo-Yo yell "Roland no, no, no, no" immediately before the gunshots; as well as Appellant's arrest at JFK Airport. The warrants for the house additionally described the Schuylkill Road surveillance video, which depicted individuals crossing the street and getting

into an SUV at 5:18 A.M. on the morning of the murder, along with other surveillance video appearing to show a Honda CRV in the vicinity of the murder scene, as well as evidence that Appellant owned a Honda CRV registered at 704 Schuylkill Avenue, which also was listed on Appellant's license. The affidavit for the residence also stated that officers "observed multiple surveillance cameras on the exterior of 704 Schuylkill Avenue." *Id.* at 3.

We conclude that these averments established probable cause that evidence of Decedent's murder would be found within 704 Schuylkill Road, and specifically that a search could reveal surveillance video from the cameras on the exterior of Appellant's residence, which in turn could have recorded Appellant and others exiting and entering the residence around the time of the crime. Accordingly, we conclude that the trial court did not abuse its discretion in denying suppression of the DVR evidence.

**E.**

For the reasons set forth above, we reject Appellant's challenges to the trial court's jury instructions, the admission of officers' testimony, and the denial of suppression.  Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/8/2024