J. S73009/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :     IN THE SUPERIOR COURT OF
                                      :            PENNSYLVANIA
                   v.                :
                                        :
THOMAS TYMA,               :            No. 1908 WDA 2015
                                        :
           Appellant    :

Appeal from the PCRA Order, November 10, 2015,
in the Court of Common Pleas of Allegheny County
Criminal Division at Nos. CP-02-CR-0002031-2011,
CP-02-CR-0002032-2011, CP-02-CR-0002034-2011
CP-02-CR-0002564-2011, CP-02-CR-0002583-2011
CP-02-CR-0004424-2011, CP-02-CR-0004600-2011
CP-02-CR-0007833-2011, CP-02-CR-0011977-2011

BEFORE:  FORD ELLIOTT, P.J.E., LAZARUS AND JENKINS, JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:     **FILED DECEMBER 1, 2016**

Thomas Tyma appeals from the November 10, 2015 order denying his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546.  After careful review, we affirm.

The lengthy factual background of this case was summarized in a prior memorandum of this court on direct appeal and need not be reiterated here. **See Commonwealth v. Tyma**, 93 A.3d 513 (Pa.Super. 2013) (unpublished memorandum at 2-13).  In sum, between January and May 2011, the Commonwealth filed nine separate criminal complaints against appellant, a rheumatologist, relating to his inappropriate touching of 21 former patients during medical exams.  Seventeen of those former patients testified against

appellant at trial, and in the majority of cases, the complainant testified that during a routine heart exam, appellant touched her breast in a manner unrelated to the exam. In every instance but one, the inappropriate touching occurred when the patient was alone with appellant.

On March 12, 2012, appellant waived his right to a jury and proceeded to a bench trial. Appellant was represented at trial by Stanton D. Levenson, Esq. (hereinafter, "trial counsel"). Following a six-day trial, appellant was found guilty of 18 counts of indecent assault and 17 counts of harassment[1] on March 19, 2012. On May 24, 2012, appellant was sentenced to an aggregate term of 60 days' imprisonment, followed by one year of county intermediate punishment and six years of concurrent probation. On June 4, 2012, appellant filed timely post-sentence motions, which were denied by the trial court on June 28, 2012. Appellant filed a timely notice of appeal on July 5, 2012. On December 18, 2013, a panel of this court affirmed appellant's judgment of sentence. **See Tyma**, 93 A.3d 513. Appellant did not file a petition for **allocatur** with our supreme court.

Thereafter, on October 27, 2014, appellant filed a timely PCRA petition. The Commonwealth filed its answer to appellant's PCRA petition on March 31, 2015. On May 1, 2015, appellant filed a response to the Commonwealth's answer. On June 25, 2015, the PCRA court provided appellant with notice, pursuant to Pa.R.Crim.P. 907(1), of its intention to

---

[1] 18 Pa.C.S.A. §§ 3126(a)(1) and 2709, respectively.

dismiss his petition without a hearing. Thereafter, on November 10, 2015, the PCRA court dismissed appellant's petition without a hearing. This timely appeal followed on December 4, 2015. On December 16, 2015, the PCRA court ordered appellant to file a Rule 1925(b) statement by February 5, 2016. On February 4, 2016, appellant complied with the PCRA court's directive and filed a Rule 1925(b) statement spanning 23-pages and raising 29 distinct claims of ineffectiveness of trial counsel. The PCRA court filed a comprehensive, 30-page Rule 1925(a) opinion, accompanied by a three-page appendix, on May 12, 2016.

On appeal, appellant raises the following issues for our review:

I.   Whether the PCRA Court Erred by Dismissing Appellant's PCRA Petition Without a Hearing on Trial Counsel's Ineffectiveness: (A) for Failing to Call Available Exculpatory Witnesses; (B) for Failing to Impeach Complainants with Available Exculpatory Evidence; (C) for Failing to Introduce Exculpatory Evidence, and (D) for Failing to Obtain Evidence[?]

II.  Whether the Cumulative Effect of [Trial] Counsel's Errors Deprived Appellant of His Sixth Amendment Right to Effective Assistance of Counsel?

Appellant's brief at 1.

Proper appellate review of a PCRA court's dismissal of a PCRA petition is limited to the examination of "whether the PCRA court's determination is supported by the record and free of legal error." ***Commonwealth v. Miller***, 102 A.3d 988, 992 (Pa.Super. 2014) (citation omitted). "The PCRA court's

findings will not be disturbed unless there is no support for the findings in the certified record." ***Commonwealth v. Lawson***, 90 A.3d 1, 4 (Pa.Super. 2014) (citations omitted). Where the PCRA court has dismissed a petitioner's petition without an evidentiary hearing, as is the case here, we review the PCRA court's decision for an abuse of discretion. ***See Commonwealth v. Roney***, 79 A.3d 595, 604 (Pa. 2013), ***cert. denied***, ___ U.S. ___, 135 S.Ct. 56 (2014) (citation omitted). "This Court grants great deference to the findings of the PCRA court, and we will not disturb those findings merely because the record could support a contrary holding." ***Commonwealth v. Hickman***, 799 A.2d 136, 140 (Pa.Super. 2002) (citation omitted). In order to be eligible for PCRA relief, a defendant must plead and prove by a preponderance of the evidence that his conviction or sentence arose from one or more of the errors listed at 42 Pa.C.S.A. § 9543(a)(2). Further, these issues must be neither previously litigated nor waived. 42 Pa.C.S.A. § 9543(a)(3).

Instantly, appellant's claims challenge the effectiveness of his trial counsel. To prevail on a claim of ineffective assistance of counsel under the PCRA, a petitioner must plead and prove by a preponderance of the evidence that counsel's ineffectiveness "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. § 9543(a)(2)(ii). Specifically, a petitioner must establish the following three factors:

> first the underlying claim has arguable merit; second, that counsel had no reasonable basis for his action or inaction; and third, that Appellant was prejudiced.

***Commonwealth v. Charleston***, 94 A.3d 1012, 1020 (Pa.Super. 2014), ***appeal denied***, 104 A.3d 523 (Pa. 2014) (citation omitted). "A petitioner establishes prejudice when he demonstrates that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ***Commonwealth v. Johnson***, 966 A.2d 523, 533 (Pa. 2009) (citations and internal quotation marks omitted).

"[C]ounsel is presumed to be effective and the burden of demonstrating ineffectiveness rests on appellant." ***Commonwealth v. Ousley***, 21 A.3d 1238, 1242 (Pa.Super. 2011), ***appeal denied***, 30 A.3d 487 (Pa. 2011) (citation omitted). Additionally, we note that counsel cannot be found ineffective for failing to raise a claim that is devoid of merit. ***See***, ***e.g.***, ***Commonwealth v. Ligons***, 971 A.2d 1125, 1146 (Pa. 2009).

After a thorough review of the record, including the briefs of the parties, the applicable law, and the well-reasoned opinion of the PCRA court, it is our determination that there is no merit to the issues raised on appeal. This court has long recognized that "the right to an evidentiary hearing on a post-conviction petition is not absolute. It is within the PCRA court's discretion to decline to hold a hearing if the petitioner's claim is patently frivolous and has no support either in the record or other evidence." ***Commonwealth v. Wah***, 42 A.3d 335, 338 (Pa.Super. 2012) (internal

citations omitted). Upon review, we agree with the PCRA court's conclusions that appellant's ineffective assistance of counsel claims merit no relief.

Appellant first argues that his trial counsel was ineffective for failing to call a number of allegedly exculpatory witnesses at trial; namely, Physician Assistants ("PAs") Kelly Hefner, Allison Karan, and Natalie Cresenze, Office Manager Margaret Slagel, and former patients Mary McBride, Paula Hiteshew, Linda Graham-Love, Rosemary Renard, and Lara Louis. (Appellant's brief at 11-30.) For the following reasons, we disagree.

As the PCRA court properly recognized in its opinion, "[t]he entire point of an exculpatory witness is to exculpate -- that is, to prove that [appellant] did not do what he is accused of. However, a person who was not present at the time of the incident(s) can only establish that they did not witness the incident, not that it did not occur." (PCRA court opinion, 5/12/16 at 20.) Instantly, the record reflects that each of the victims in this case, with the exception of Roxanne Churilla, testified that they were alone with appellant when the inappropriate contact occurred, and appellant freely admitted that he did see each of these women by himself at various times. (*See* notes of testimony, 3/12-19/12 at 27, 38-41, 66, 110-111, 143-144, 156-157, 206-207, 220-221, 356-358, 370, 380-392.) Therefore, the fact that the testimony of appellant's purported exculpatory witnesses, some of whom did, in fact, testify to appellant's character at trial, would have

indicated that he did not engage in any inappropriate touching in their presence is irrelevant to whether he committed the crimes against the victims on the days in question. Accordingly, we agree with the PCRA court that trial counsel was not ineffective for failing to introduce this allegedly exculpatory testimony at trial.

Appellant further argues that his trial counsel was ineffective for failing to impeach the victims in this case with their prior convictions, medical records, or -- in the case of Leslie Hemwell -- the fact that she had a fever of 103 degrees during one of her medical examinations. (Appellant's brief at 11-30.)

Upon review, we discern no error on the part of the PCRA court in concluding that trial counsel's actions in foregoing the opportunity to impeach the victims in this manner did not constitute ineffective assistance of counsel. As the PCRA court noted, "a witness may not be contradicted on collateral matters, and a collateral matter is one which has no relationship to the case at trial." (PCRA court opinion, 5/12/16 at 23, quoting ***Commonwealth v. Saunders***, 946 A.2d 776, 786 (Pa.Super. 2008), ***appeal denied***, 958 A.2d 1047 (Pa. 2008) (internal quotation marks omitted).) We agree that the majority of the impeachment evidence proffered by appellant would have been impermissible under this standard, and in any event, the PCRA court, as fact-finder, was in the best position to judge the credibility of the victims' testimony. ***See Commonwealth v.***

*Jones*, 912 A.2d 268, 293 (Pa. 2006) (stating, "[t]he findings of a post-conviction court, which hears evidence and passes on the credibility of witnesses, should be given great deference."); *Commonwealth v. Johnson*, 966 A.2d 523, 532 (Pa. 2009) (stating, "appellate court is bound by credibility determinations of [the] PCRA court where determinations are supported by record." (citation omitted)). Accordingly, appellant's ineffectiveness claim in this regard must fail.

In his final issue, appellant contends "the cumulative effect of [trial] counsel's errors deprived [him] of his Sixth Amendment right to effective assistance of counsel." (Appellant's brief at 30-32.) We find that the PCRA court properly rejected appellant's contention that he was deprived of his Sixth Amendment right to counsel on account of the cumulative effects of trial counsel's purported ineffectiveness. (*See* appellant's brief at 30-31; trial court opinion, 5/12/16 at 29-30, § 10.) Our supreme court has held that "no number of failed [ineffectiveness] claims may collectively attain merit if they could not do so individually." *Commonwealth v. Tedford*, 960 A.2d 1, 56 (Pa. 2008) (citation omitted). In this instance, the PCRA court concluded that they do not, and we adopt Judge McDaniel's analysis as to these various claims.

Accordingly, we find that the PCRA court's May 12, 2016 opinion comprehensively discusses and properly disposes of the issues presented.

We, therefore, adopt the PCRA court's opinion addressing the merits of appellant's claims as our own for purposes of further appellate review.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  12/1/2016

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**
**CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA

v.

CC:    201102034, 201104600, 201102031
201104424, 201102032, 201111977,
201102564, 201107833, 201102583

THOMAS TYMA,

Defendant

**OPINION**

The Defendant has appealed from this Court's Order of November 10, 2015, which dismissed his Post Conviction Relief Act Petition without a hearing. However, a review of the record reveals that the Defendant has failed to present any meritorious issues on appeal and, therefore, this Court's Order should be affirmed.

The Defendant was charged with numerous offenses[1] in relation to a series of assaults the Defendant, a rheumatologist, committed against 20 of his female patients. Prior to trial, the charges relating to victims D██████ L██████ and J██K██████ were *nolle prossed.* A bench trial was held before this Court form March 12-19, 2012 and at the conclusion of trial, the Defendant was found guilty of all charges. On May 24, 2012, he appeared before this Court and was sentenced to a term of 60 days imprisonment followed by one (1) year of house arrest at Count 1 of 201102034 and two (2) consecutive terms of probation of two (2) years each, with nine (9)

---

[1] Due to the numerous charges, this Court has created a chart showing the charges, their disposition and resulting sentence, which it has attached to this Opinion as Appendix 1.

1

additional two (2) year terms of probation run concurrently with the initial sentence. Timely Post-Sentence Motions were filed and were denied on June 26, 2012. The judgment of sentence was affirmed by the Superior court on December 18, 2013. No further action was taken until October 27, 2014, when the Defendant filed a counseled PCRA Petition. After reviewing the record in its entirety as well as the Commonwealth's response and giving the appropriate notice of its intent to do so, this Court dismissed the Petition without a hearing on November 10, 2015. This appeal followed.

On appeal, the Defendant raises 29 claims[2] of the ineffective assistance of counsel. This Court has reviewed the issues and has combined and reordered them for manageability and ease of understanding and will address them as follows:

Generally, in order to establish a claim for the ineffective assistance of counsel, "a PCRA Petitioner must demonstrate, by a preponderance of the evidence, that: (1) the underlying claim is of arguable merit; (2) no reasonable basis existed for counsel's action or inaction; and (3) there is a reasonable probability that the result of the proceedings would have been different absent such error." Commonwealth v. Gibson, 19 A.3d 512, 525-26 (Pa. 2011). "The law presumes that counsel was not ineffective, and the appellant bears the burden of proving otherwise...[I]f the issue underlying the charge of ineffectiveness is not of arguable merit, counsel will not be deemed ineffective for failing to pursue a meritless issue... Also, if the prejudice prong of the

---

[2] Reference is made to the oft-cited quote from Judge Aldisert: "With a decade and a half of federal appellate court experience behind me, I can say that even when we reverse a trial court, it is rare that a brief successfully demonstrates that the trial court committed more than one or two reversible errors... When I read an appellant's brief that contains ten or twelve points, a presumption arises that there is no merit to any of them. I do not say that this is an irrebuttable presumption, but it is a presumption nevertheless that reduces the effectiveness of appellate advocacy. Appellate advocacy is measured by effectiveness, not loquaciousness." Aldisert, The Appellate Bar: Professional Competence and Professional Responsibility – a View from the Jaundiced Eye of One Appellate Judge, 11 Cap.U.L.Rev. 445, 458 (1982).

2

ineffectiveness standard is not met, 'the claim may be dismissed on that basis alone and [there is no] need [to] determine whether the [arguable merit] and [client's interests] prongs have been met.'" Commonwealth v. Khalil, 806 A.2d 415, 421-2 (Pa.Super. 2002). "With regard to the reasonable basis prong, [the appellate court] will conclude that counsel's chosen strategy lacked a reasonable basis only if the petitioner proves that the alternative strategy not elected offered a potential for success substantially greater than the course acutely pursued." Commonwealth v. Busanet, 54 A.3d 35, 46 (Pa. 2012).

*1.     Failure to Petition for a Writ of Habeas Corpus*

Initially, the Defendant argues that trial counsel was ineffective for failing to file a Petition for Writ of Habeas Corpus to challenge the Commonwealth's evidence at the preliminary hearing. He asserts that because the Commonwealth did not present expert testimony at the preliminary hearing, it was unable to establish certain elements of the crimes charged.

At a preliminary hearing, "the standard of proof for the Commonwealth is merely to establish a prima facie case (i.e. that a crime has been committed, and that the accused is probably the one who committed it), and there is no requirement that the Commonwealth establish the accused's guilt beyond a reasonable doubt at this stage." Commonwealth v. Rogers, 610 A.2d 970, 972 (Pa.Super. 1992). "Although a preliminary hearing may permit capable defense counsel to lay the groundwork for a trial defense, its intended purpose is not primarily to provide defense counsel with the opportunity to assess the credibility of Commonwealth witnesses, or to prepare a defense theory for trial, or to design avenues for the impeachment of witnesses at trial. Nor is the purpose of a preliminary hearing to prove a defendant's guilt.

3

Indeed, once a defendant has gone to trial and has been found guilty of the crime or crimes charged, any defect in the preliminary hearing is rendered immaterial." Commonwealth v. Sanchez, 82 A.3d 943, 984 (Pa. 2013).

A close examination of the Defendant's first claim reveals that it is actually a challenge to the sufficiency of the evidence presented at the preliminary hearing. In light of the Defendant's conviction beyond a reasonable doubt, any claims the Defendant has regarding the Commonwealth's establishment of a prima facie case at the preliminary hearing are moot. See Sanchez, *supra*. The Defendant has not established a claim for the ineffective assistance of counsel in this regard and so this claim must fail.

2.    *Failure to File a Pretrial Motion to Dismiss*

Next, the Defendant argues that counsel was ineffective for failing to file a Motion to Dismiss because Allegheny County District Attorney Stephen Zappala's signature on the Criminal Information was stamped and not hand-signed.

Our appellate courts have held that "a rubber stamped facsimile of the district attorney's signature was sufficient compliance with the requirement of Pa.R.Crim.P. 225(b) that an information be signed by the attorney for the Commonwealth." Commonwealth v. Evans, 473 A. 2d 606, 607 (Pa.Super. 1984), citing Commonwealth v. Emanuel, 462 A.2d 653 (Pa. 1983).

Here, the Defendant makes no argument that the charges were improperly brought or somehow brought by a rogue staff member without the authorization of Mr. Zappala or contrary to Mr. Zappala's intent. Rather, the Defendant's claim is entirely directed at the mere use of a signature stamp instead of an original signature. Although this is not the most egregiously meritless issue now brought by the Defendant (shockingly), it is emblematic of the wasteful

4

31a

nature of his claims. The stamp of Mr. Zappala's name was appropriate and legal and in no way gives rise to a claim of ineffectiveness. This claim must fail.

3.    *Imputed Guilt During Jury Trial Waiver*

Next, the Defendant argues that counsel's reference to the accusers as "victims" during the jury trial waiver was "unauthorized" and "imput[ed] guilt to the Petitioner and caus[ed] a complete breakdown in the adversarial process."

The following occurred during the jury trial waiver colloquy:

THE COURT: Bring your client forward, Mr. Levenson.

State your name.

THE DEFENDANT: Thomas Allen Tyma, M.D.

THE COURT: How old are you?

THE DEFENDANT: Fifty-four years old.

THE COURT: How much education have you had?

THE DEFENDANT: Through medical school; 24 years.

THE COURT: Are you able to read, write -

THE DEFENDANT: I'm sorry; 26 years.

THE COURT: Are you able to read, write and understand the English language?

THE DEFENDANT: Yes.

THE COURT: Have you had any drugs and alcohol in the last 48 hours?

THE DEFENDANT: No.

THE COURT: Do you understand that you are charged at apparently nine informations. You are charged with indecent assault at case ending in 977, and it is alleged that you had indecent contact with L█████ S█████ And that is █████

5

32a

███████, or caused her to have indecent contact with you without her consent. This is punishable by two years of imprisonment.

You are also charged with a summary of harassment at that information.

At the case ending in 564, you are charged with two counts of indecent assault. In count one, it is alleged that J███ M██████████ is the victim. In count two, M██ J███ S███ is the alleged victim. Each of those are punishable by two years in jail.

You are charged with one summary of harassment.

At the criminal complaint ending in 034, it is alleged that T███ J████████ ███ is the victim. Count two alleges B████ s█████. Count three alleges U███ G███ is the victim. Count four, J██ S█████████ is the victim. Count five is A████ M████████████ is the victim. And count six alleges D████ M███████████ is the victim.

Each of these are punishable by not more than two years of imprisonment.

You are also charged with six summary counts of harassment with the alleged victims being the same.

And at the case ending in 032, E████████████ G█████ is the victim. That is punishable by two years of imprisonment. As well as a summary count of harassment.

At the criminal complaint ending in 031, count one alleges D███ L██████ ███ is the victim. Count two alleges R██████ T█████ is the victim. Count three, J█ K████████████ is the victim. Each of those are punishable by two years. And there are three corresponding counts of harassment.

At the criminal complaint ending in 833, it is alleged that M██ J██ S████████ ███ is the victim. That is punishable by two years of imprisonment and one corresponding count of harassment.

At the criminal complaint ending in 600, it is alleged that L██████ H████ is the victim.

And at the case ending in 424, it is alleged that F██████ F███ is the victim. ███ ██████ And there is one corresponding count of harassment.

6

At the criminal complaint ending in 583, count one alleges C███ W██ is the victim. Count two alleges R████ C████ is the victim. Count three alleges L██ R███████████ as the victim. Count four alleges that G██ J████-S█████████████ is the victim. This is punishable by two years of imprisonment. There are four corresponding counts of summary harassment.

THE COURT: I added those wrong.

MS. DiGIOVANNI: I believe it's two -

**MR. LEVENSON: Two for each victim.**

MS. DiGIOVANNI: There have been 18 victims, so 18 counts of indecent assault.

THE COURT: Most, excluding the summaries, are punishable by a maximum term of imprisonment not to exceed 36 years. That's when you add them all together and they run back to back. Okay.

THE DEFENDANT: All right.

THE COURT: Do you understand that you have the absolute right to have a trial by jury, and you have decided to waive that and proceed in a non-jury trial, is that correct?

THE DEFENDANT: That is correct.

THE COURT: And to that end, you have read the waiver of jury trial form, which I will accept.

Has anybody promise you anything or threatened you in any way that may have influenced your decision?

THE DEFENDANT: No.

THE COURT: I will accept the waiver.

(Trial Transcript, p. 3-7), *emphasis added.*

"When the court is sitting as fact-finder, it is presumed that inadmissible evidence is disregarded and that only relevant and competent evidence is considered... In a non-jury trial,

7

the court is presumed to have disregarded evidence too prejudicial to be considered by a jury, thus assuming that the court in a bench trial would follow the very instructions which it would otherwise give to a jury." Commonwealth v. Gonzales, 609 A.2d 1368, 1371 (Pa.Super. 1992). See also Commonwealth v. Fears, 86 A.3d 795, 819 (Pa. 2014).

It is clear that the Defendant and his counsel hold this Court in very low regard, as evidenced by his claim on direct appeal that this Court misrepresented the evidence (which the Superior Court found to be without merit) and also by this claim, wherein he alleges that this Court was so prejudiced by Mr. Levenson's single reference to "victims" that it was unable to listen to the evidence and render a fair verdict based on that evidence, leading to the aforementioned "complete breakdown in the adversarial process." This Court is incredulous that defense counsel would challenge this Court's judgment and fairness in such a manner and again, this reflects on the merits of the Concise Statement as a whole. To the extent that it is even necessary to state, Mr. Leveson's single use of the word "victims" during the jury trial waiver did not prejudice this Court, did not lead this Court to pre-judge the merits of the case, nor did it lead to a "complete breakdown in the adversarial process." This claim is utterly without merit.

4.      *Unlawful Inducement of Jury Trial Waiver*

Next, the Defendant argues that his waiver of jury trial was unlawfully induced by trial counsel, who "misled" him regarding his chances of success.

It is well-established that in order to be valid, "a jury waiver must be knowing and voluntary, and the accused must be aware of the essential ingredients inherent to a jury trial... (1) that the jury be chosen form members of the community (i.e., a jury of one's peers), (2) that the accused be allowed to participate in the selection of the jury panel, and (3) that the verdict be

8

35a

unanimous." Commonwealth v. Houck, 948 A.2d 780, 787 (Pa. 2008), internal citations omitted. "It is the defendant's burden…to establish that a jury waiver is invalid." Id. at 788.

Here, the Defendant does not point to any evidence which demonstrates that he was unaware of the rights he was waiving. He claims, essentially, that defense counsel led him to believe that the verdict would be not guilty in a bench trial. This Court, being familiar with Mr. Leveson's work experience and reputation, simply cannot believe that Mr. Levenson would have promised an acquittal in a non-jury trial. The Defendant's unhappiness with the verdicts is clear, but that unhappiness does not render his jury trial waiver invalid. The Defendant filled out a written waiver form and engaged in an oral colloquy with this Court, reproduced above. Much as a criminal defendant who pleads guilty is bound by the statements made during the colloquy and "may not assert grounds for withdrawing the plea that contradict the statements made when he pled," Commonwealth v. Stork, 737 A.2d 789, 790-91 (Pa.Super. 1999), the Defendant is bound by his own statements during the jury trial waiver colloquy, wherein he indicated that he had not been promised anything to influence his decision. The Defendant cannot now claim that counsel induced his jury trial waiver by promising a not-guilty verdict. This claim is meritless.

5.      *Failure to Call Exculpatory Witnesses*

The Defendant has raised 11 separate claims that counsel failed to call various witnesses, whom he deems "exculpatory". They are: Physician Assistants Kelly Hefner, Allison Karan and Natalie Cresenze, who between them account for 8 of the claims; Office Manager Margaret Slagel; and five (5) patients who submitted letters on his behalf, three (3) of whom did actually testify at trial.

As it specifically relates to a claim for ineffectiveness for the failure to call a witness, the petitioner must establish that "(1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial." Commonwealth v. Matias, 63 A. 3d 807, 810-811 (Pa.Super. 2013). "Failure to call a witness is not per se ineffective assistance of counsel, for such a decision implicates matters of trial strategy. It is [the petitioner's] burden to demonstrate that trial counsel had no reasonable basis for declining to call [a particular person] as a witness. 'Generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests.' **A claim of ineffectiveness generally cannot succeed through comparing, in hindsight, the trial strategy employed with alternatives not pursued.**" Commonwealth v. Hammond, 953 A.2d 544, 558 (Pa.Super. 2008), *emphasis added.*

With regard to the claims relating to Physician Assistants Kelly Hefner, Allison Karan and Natalie Cresenze, the Defendant now asserts that on various visits of patients C███ W███ (PA Kelly Hefner), R███ C███ (PA Allison Karan), B███ S███, F███ F███, T███ J███ and J███ M██ (PA Natalie Cresenze), as well as L███ H███ and U███ G██ (both PA Allison Karan and PA Natalie Cresenze), the Physician Assistants would have testified that they were the principal examiners of the patients and that the Defendant either did not examine them at all or merely made a perfunctory visits with an abbreviated exam or none at all.

10

37a

At trial, the Defendant testified regarding his typical practice and procedures and how he utilized the Physician's Assistants:

Q. (Mr. Levenson): And what was the job of the physician assistant?

A. (The Defendant): They were our right hand. They work with us. We were a team. And they would see stable patients. And they would se most of the new patients by themselves, and then come out and present those patients to one of the doctors, who would then go in and see the patient...

Q. Before seeing her did anyone else in your office see her first?

A. Yes.

Q. Who?

A. Our relatively new physician assistant, Allison.

Q. And why was that?

A. Because that's the way we typically ran new patients. To have the physician assistant see them first. Refer with us and review the history and physical exam findings. And at this point, because she was working with us, have her come up with a treatment plan so that I could teach her as we went in together as a team then to evaluate the patient.

(T.T. pp. 343, 367-368).

On direct examination, the Defendant testified that he saw the various patients both alone and with a Physician Assistant. Regarding C██ W█:

Q. (Mr. Levenson): Approximately how many times did you see ███ West?

A. (The Defendant): Five times that we saw her in the office. Two of those were with myself alone and three of those were with Kelly and myself.

(T.T. p. 392).

Regarding R████ C████:

Q. (Mr. Levenson): And was your physician assistant in the room while you conducted this physical examination of ███ C████?

11

38a

A. (The Defendant): Not only was she in the room, she was watching my technique. She was a relatively new physician assistant and I was teaching her points as we went along.

(T.T. p. 369).

Regarding B████ S██████:

Q. (Mr. Levenson): Dr. Tyma, was B████ S█████ a patient of yours?

A. (The Defendant): Yes.

Q. And how many times did you see her?

A. I saw her three times.

Q. What did you see her for?

A. She was referred to us because of whole body pain and possibly Lupus. She was looking for a second opinion after seeing another rheumatologist.

Q. How many times did you see her alone?

A. Twice.

(T.T. p. 380).

Regarding F██████ F████:

Q. (Mr. Levenson): Dr. Tyma was F██████ F████ a patient of yours?

A. (The Defendant): Yes.

Q. How many times did you see ████ F████?

A. I saw her three times. Once with Natalie, the physician assistant, as the last patient was, and then twice alone.

(T.T. p. 382).

Regarding T████ J████:

Q. (Mr. Levenson): Was T████ J████ a patient of yours?

12

39a

A.    (The Defendant): Yes.

Q.    And how many times did you see her? Would it have been two times?

A.    Yes.

Q.    How many times did you see her alone?

A.    Once. Second visit. First visit with Natalie.

(T.T. p. 386).

Regarding J███ M██:

Q.    (Mr. Levenson): Was J███ M██ a patient of yours?

A.    (The Defendant): Yes, she was.

Q.    When did you first see her?

A.    I began seeing her at UPMC Passavant Hospital, with initial consultation on August 30 of 2008, for severe joint and muscle pain, which is what she was admitted to the hospital with.

Q.    And what happened during that initial visit with ███ M██?

A.    I did a full consultative history and physical examination, including a heart examination.

Q.    And how many times did you see her after that initial examination?

A.    I saw her two more times while in the hospital…My physician assent then saw her and we saw her for five more visits.

(T.T. p. 356, 358).

Regarding L██ H████:

Q.    (Mr. Levenson): Is L██ H████ a patient of yours?

A.    (The Defendant): Yes.

Q. Where did you see ███ H████?

A. It began seeing her at Passavant Hospital only. I never saw her in the office.

(T.T. p. 387); and

Regarding U███ G███:

Q. (Mr. Levenson): Was U███ G███ a patient of ours [sic]?

A. (The Defendant): Yes, she was.

Q. And how many times did you see ███ G███?

A. I personally saw her at least 22 times. And there may have been more than that.

(T.T. p. 370).

The record also reflects that, with the exception of R███ C███, all of the women testified that the touchings occurred when they were alone with Dr. Tyma:

Q. (Ms. DiGiovanni): Were there any times that you were alone with Dr. Tyma?

A. (C███ W██): Yes.

Q. Were you alone with Dr. Tyma for one of the physicians one time or more than one time?

A. One time.

Q. And can you tell me what happened during that exam when you were alone with Dr. Tyma?

A. Yes. I was in the room sitting on the edge and he came in by himself and asked how I was doing. I do remember him checking my neck, both sides. He asked me then to lie back on the examination table. I was fully

14

clothed. At that point, he took his right hand inside my blouse and covered my left breast.

(T.T. p. 27).

Q.   (Ms. DiGiovanni): Did anyone take a history or talk to you about the nature of your illness at all?

A.   (B███ S██████): Yeah. I think she did it then. I filled out the paperwork, then she just kind of reviewed it real quick.

Q.   Now, at some point did Dr. Tyma come into the room?

A.   Yes.

Q.   When Dr. Tyma came into the room, was anyone else with you besides you and Dr. Tyma?

A.   No.

(T.T. p. 66).

Q.   (Ms. DiGiovanni): When you first met Dr. Tyma for the very first time, were you in an exam room?

A.   (F████ F████): Yes.

Q.   Was Dr. Tyma in there just by himself with you or was there anyone else present?

A.   Myself.

Q.   During the initial meeting, did you describe for Dr. Tyma your symptoms and why it was you came to see him?

A.   Yes, ma'am.

Q.   And Dr. Tyma performed a physical exam?

A.   Yes.

Q.   Please tell us the details how that physical exam went.

15

42a

A.      He had me stand. And he checked my hips. He had me sit on the bed. He checked my heart and stuff. And then he had me lay back and he had me pull up my sweater. I had on an under wire bra that day and when my left arm came up, my breast was exposed. He then proceeded to put his left hand here and he come down, he put his left hand on my right shoulder. He put his right hand on my left breast. He came down and then he brought his other hand down. It was swiped. His left hand here and swiped down by my pelvic area.

(T.T. p. 110-111).

Q.      (Ms. DiGiovanni): But you went to another location for the lab work, is that correct?

A.      (T█████ J██████): Yes.

Q.      Did you then have further contact with Dr. Tyma?

A.      After the lab work, I was taken to another room, a different room, and then I waited until he came in there.

Q.      When you say he, you mean Dr. Tyma?

A.      Yes.

Q.      When Dr. Tyma came into this third room, were you and he alone together?

A.      Yes.

Q.      Was the door open or closed, do you recall?

A.      Closed.

Q.      And while you and Dr. Tyma were alone in that third room, can you tell me exactly what happened in that room?

A.      It's been so long ago, but I mean, we discussed the lab work and I mean, just discussed my condition and then he continued with his exam.

Q.      When you say continued with his exam, what exactly did Dr. Tyma do?

16

A. I was on, I guess the bed, the thing that he had in there to lie back on. And he was asking me questions and standing in front of me and looking at me. And then somewhere along the line, he just grabbed my breast and just kind of massaged it and then stopped and turned his back to me and just left me there.

Q. When you say he grabbed your breast, which breast?

A. My left breast.

Q. And you said grabbed and massaged, is that correct?

A. Right.

(T.T. p. 206-207).

Q. (Ms. DiGiovanni): When you went to that first visit, did you have an appointment specifically with Dr. Tyma?

A. (J███ M██): Yes.

Q. And can you tell me when you went to the Wexford office, were you taken into the exam room?

A. Yes.

Q. Did you meet with any other personal that day other than Dr. Tyma?

A. No.

Q. So when Dr. Tyma came to the exam room, were you and he alone in the room?

A. Yes.

Q. Was the exam door open or closed?

A. Closed...

...Q. Did Dr. Tyma perform any further physical exam beyond your hands?

A. Yes.

17

44a

Q.     What else happened?

A.     He had me lie back on the table. He listened to my heart beat with the stethoscope. And then he took the stethoscope and put it around his neck and proceeded to lift my shirt and lifted my bra and started to rub my breast.

(T.T. p. 220-221).

Q.     (Ms. DiGiovanni): At some point when Dr. Tyma was in your hospital room, did anything you found to be inappropriate happen?

A.     (L███ H███████): Yes. I don't know what number was the third or fourth time, but before his last visit, he did touch me inappropriately on my breasts.

Q.     Was this the time right before the last visit?

A.     Yes, ma'am.

Q.     Again, when Dr. Tyma came in the room, was the curtain closed?

A.     Yes, ma'am.

Q.     Explain for me exactly what happened during that visit.

A.     It started out as all the other physicals would start out. Again, he would look at my legs for any kind of swelling. At that time, I had dermatitis. A skin breakout on my arms and along my collar bone and the back of my neck. After looking at my legs and talking to me, he wanted to check my skin, which I also had been counseled through with a dermatologist. So he wanted to check and see how my skin had been doing. So, I was wearing a gown and he looked at my skin, looked at my collar bone. And as he was kind of leading over me and as he went to go stand up, he grabbed my left breast. It was very quickly.

(T.T. p. 143-144).

Q.     (Ms. DiGiovanni): At any point in time, ███ G███, did anything happen during any exams with Dr. Tyma that you found to be inappropriate?

A.     (U███ G███): Yes.

Q. How many times did something happen that was inappropriate?

A. All together, two times.

Q. Two times?

A. Yes.

Q. Do you recall the first time?

A. I do. And when it happened, I dismissed it as an accident because accidents do happen.

Q. So, the first time that something happened, can you describe for me initially tell me were you in the room alone with Dr. Tyma or was someone else in the room?

A. Alone.

Q. And describe for me exactly what happened during this first occasion.

A. Well, it was the first time, I mean he took his stethoscope and was listening to my heart and at the same time, he had his fingers around my breasts. Not the bare breast. Talking about the bra...

Q. And did another incident happen that you found to be inappropriate?

A. Yes.

Q. Were you alone with Dr. Tyma?

A. Yes.

Q. Was the examination room door open or closed?

A. Closed.

Q. Can you describe for me the second incident exactly what happened?

A. Okay. he did the same thing. He listened to my heart and I was laying on the exam table. And he had the stethoscope in his hand and while he was listening, he adjusted his hand. I will have to show you. Okay. Because it went like this and then his whole entire hand was over my breast.

19

(T.T. pp. 154, 156-157).

R█████ C█████ testified that though a Physician Assistant was in the room, she was not

paying attention to what was occurring:

Q.     (Ms. DiGiovanni): At that point in time, after you had this discussion with
       Dr. Tyma, he performed a physical exam on you?

A.     (R███ C███): Yes.

Q.     Can you tell me as best you can how the physical exam progressed.

A.     First, they had me undress down to a robe. And like I said, the pain was
       all in the neck and the jaw, but he proceeded to touch in other areas that
       were not a bother. And I did say before the exam even started, my body
       hurts except my butt area. But he proceeded to touch my body, grope both
       of my breasts, put his hand down my back side and touch my butt. And
       asked if I had any pain in the butt area or the breast area and my inner
       thigh area. And I told him no. Those were none of the areas of pain.
       That's not what I'm here for. I don't have pain in those areas…

…Q.   How long were you in the exam room before someone came in?

A.     There was actually a woman the whole time with me writing down notes.
       But I concentrated on her and she never picked her head up.

(T.T. pp. 38, 41).

The entire point of an exculpatory witness is to exculpate - that is, to prove that the

defendant did not do what he is accused of. However, a person who was not present at the time

of the incident(s) can only establish that they did not witness the incident, not that it did not

occur. As noted above, all of the women identified regarding this issue, with the exception of

R█████ C█████, testified that they were alone with Dr. Tyma when the touchings occurred, and

Dr. Tyma admitted that he did see each of these women by himself at various times. Therefore,

testimony of three (3) Physician's Assistants, who would presumably have only testified that

20

nothing inappropriate occurred when they were in the room, is essentially meaningless. Unless the Defendant can prove that he was accompanied by one of these Physician's Assistants every single time he saw a patient and he was never alone with any patient - which he has admitted is not the case - then their testimony is not exculpatory and in fact, not even relevant to the charges.

A similar scenario ensues with the proposed testimony of Office Manager Margaret Slagel. The Defendant now asserts that she would testify that she never heard any complaints of inappropriate behavior from the Defendant's patients. Again, unless the Defendant can prove that Ms. Slagel was present with the Defendant for every single patient interaction, her testimony is similarly not relevant.

In Commonwealth v. Heilman, 867 A.2d 542 (Pa.Super. 2005), our Superior Court held that "an absence of evidence is not evidence of absence." Commonwealth v. Heilman, 867 A. 2d 542 ( Pa.Super. 2005), *emphasis added*. The fact that the Physicians Assistants and Office Manager did not witness or hear reports of any inappropriate conduct does not mean that the conduct did not occur - and in fact the sufficiency and weight of the evidence have already been upheld by our Superior Court on the direct appeal of this matter. Because the proposed testimony of Physician Assistants Kelly Hefner, Allison Karan and Natalie Cresenze and Office Manager Margaret Slagel would not have established any material facts or reasonable inferences regarding any material facts or made any facts at issue more or less probable, see Commonwealth v. Hawk, 709 A.2d 373, 376 (Pa. 1998), their testimony was not relevant and counsel was not ineffective for failing to present it.

Similarly, the Defendant argues that counsel was ineffective for failing to present the testimony of five (5) patients, M███ M███, P██ H████, L██ G███-L██, R████

21

48a

R██ and L██ L██ who would have testified that the Defendant did not touch them inappropriately and that touching the breast was necessary for the exam. This Court notes that four (4) of these women - M██ M████, L██ G████-L██, R████ R███ and L██ L██ did testify as character witnesses on the Defendant's behalf. To the extent that the Defendant is attempting to extrapolate a claim of innocence of all claims because he was able to identify five (5) patients whom he did not assault, this claim is meritless. Simply because the Defendant did not assault the five (5) women named did not mean that he did not assault the complainants in these matters and their testimony would not provide a basis for an acquittal. Moreover, as to the claim that these women would testify that touching the breast is necessary for a full examination, the Defendant presented expert testimony to that effect which this Court considered before reaching its verdict and which the Superior Court also reviewed when upholding the weight and sufficiency of the evidence on direct appeal. Although these patients may have been able to testify as to how the Defendant examined them - which actually does not have any bearing on whether he touched the victims in the cases - certainly these patients are not medical experts and are not qualified to give expert testimony on how an exam should be conducted. The Defendant cannot have it both ways. Any substantive testimony regarding their own treatment with the Defendant was not relevant to the allegations in this case and so counsel was not ineffective for failing to present it. This claim is meritless.

6. *Failure to Impeach Witnesses*

Next, the Defendant argues that counsel was ineffective for failing to impeach several of the victims with prior convictions, information from their medical records and, in one

incomprehensible claim, with the fact that L███ H████ had a fever of 103 degrees during one of her examinations. These claims are meritless.

Although "evidence of a witness's conviction for a crime involving dishonesty or a fake statement is generally admissible", counsel's failure to introduce that evidence is not *per se* ineffectiveness if there is a "reasonable strategic basis for not impeaching". Commonwealth v. Small, 980 A.2d 549, 565-66 (Pa. 2009). However, "a witness may not be contradicted on 'collateral' matters, and a collateral matter is one which has no relationship to the case at trial." Commonwealth v. Saunders, 946 A.2d 776, 786 (Pa.Super. 2008). "The pivotal issues in a trial cannot be 'side-tracked' for the determination of whether or not a witness lied in making a statement about something which has no relationship to the case on trial. The purpose of trials is not to determine the ratings of witnesses for general veracity. A witness can be contradicted only on matters germane to the issue trying. There is no rule more firmly established than this." Commonwealth v. Petrillo, 19 A.2d 288, 295 (Pa. 1941).

The Defendant now argues that R███ C███, E███ G███, D██ M███ and A███ M███ should have been impeached with their prior convictions for bad checks (D██ M███ and E███ G████), retail theft (R███ C███ and A███ M███), disorderly conduct (R███ C███ and A███ M███) and harassment (R███ C███). A careful review of the record reveals that E███ G███ was impeached with her prior convictions during cross-examination (See Trial Transcript, p. 63), however, the remaining convictions were not mentioned.

This Court, which was sitting as the fact-finder in this matter, can say with certainty that even had the impeachment evidence been introduced, the result would not have been different.

23

The existence of a prior conviction does not mean that a person cannot be victimized or that her testimony regarding that victimization is not believable *ab initio*. In its capacity as fact-finder, this Court listened to the victims' testimony and made determinations regarding that testimony. The existence of the impeachment evidence, though not pursued by counsel, would not have changed this Court's findings, and so, necessarily, counsel was not ineffective in failing to present it.

Additionally, the Defendant argues that several of the victims should have been "impeached" with various items in their medical records including whether they left the office immediately after the assaults or stopped to schedule a follow-up appointment, that they had symptoms of depression or mental illness in the past, that they received pain medication from other physicians, that they called him after an assault with a question about vitamins and in the most incredible of all claims, that counsel failed "to introduce evidence that L.H. ████ ████ had a fever of 103 degrees at the time she claims Petitioner had 'grabbed' her breast for one second while standing up from examining a rash on her left arm and shoulder and collarbone" (Petitioner's Concise Statement of Matters Complained of on Appeal, p. 13-14).

Whether the victims failed to immediately flee the office after being assaulted or whether they called him to ask about vitamins or whether they had prior symptoms of depression or even a fever, is irrelevant to the claims at issue in trial, namely whether they were assaulted or not. As such, all of these various matters would have been considered impeachment on a collateral matter and would not have been permitted. Therefore, counsel was not ineffective for failing to attempt it. This claim is meritless.

24

Also within the ambit of impeachment evidence, the Defendant now claims that counsel was ineffective for failing to impeach all of the victims with their "demeanor" in his office, at the preliminary hearing and in the Courthouse hallways. He makes no specific claims of misconduct, save to say that there was "a plethora of demeanor impeachment evidence showing the complainants (who were not victims) in a true light had no reasonable basis." (Petitioner's Concise Statement of Matters Complained of on Appeal, p. 21).

It is clear that the Defendant views his victims as *less* - less worthy than others, less worthy of belief, certainly less than himself. For a criminal defendant to say that a victim's demeanor in his office or at a preliminary hearing or in the Courthouse hallway - without pointing to any specific instance - is proof that she is lying is, by any measure, incomprehensible to this Court. This Court would not have admitted such nonspecific and baseless evidence, and so counsel was not ineffective for failing to attempt it. This claim is meritless.

7.  *Failure to Present Evidence*

Next, the Defendant also argues that counsel was ineffective for failing to introduce illustrations from a medical textbook showing a cardiac exam and a list provided by the Defendant to trial counsel indicating that he wanted R█████ C█████ to be a character witness. His claims are meritless.

Regarding the illustrations from a medical textbook, the Defendant claims that these would demonstrate "that a proper cardiac examination requires the physician to have contact with the woman's breast" (Petitioner's Concise Statement of Matters Complained of on Appeal, p. 20). However, at trial, the Defendant presented the expert testimony of Dr. Emilio Gonzales and Dr. Chester Oddis, both of whom testified that it is necessary to touch the breast during a

cardiac examination. (See T.T., p. 282, 301). Any illustrations from a medical textbook would have been cumulative of that expert testimony and therefore not necessary, and so counsel was not ineffective in failing to introduce them. Again, this claim must fail.

The Defendant also avers that trial counsel was ineffective "for failing to introduce evidence that, in preparing his defense Petitioner included L.R. ███████ in the list of patients to whom he sent a letter asking them to be character witnesses for him." (Petitioner's Concise Statement of Matters Complained of on Appeal, p. 18). According to the Defendant, the letter "shows Petitioner's state of mind, and establishes that he did nothing wrong with respect to L.R.". (Petitioner's Concise Statement of Matters Complained of on Appeal, p. 18). This claim is simply meritless. Whether or not the Defendant wanted L██ R██ to be a character witness (presumably before her charges were filed, though the Concise Statement does not specify) has no bearing on the merits of the case. Said another way, the Defendant is not entitled to an acquittal simply because he included one victim's name on a list of potential character witnesses. If this were the case, certainly every criminal defendant would do the same. The Defendant already testified that his touching of L██ R██ was part of his medical examination and it was not necessary to introduce the list to establish his "state of mind". There is no basis for a claim of ineffectiveness here. This claim must fail.

8.    *Failure to Subpoena Records*

The Defendant also argues that trial counsel failed to subpoena the medical records of L████ S████ and M██ J██ S███. Again, these claims are meritless.

Regarding the records of L█████ S████, the Defendant argues that their counsel was ineffective for failing to subpoena "medical charts and progress notes" from Jameson Hospital in

New Castle. At trial, Ms. S[redacted] testified that she saw the Defendant on one occasion at an appointment which took place at the hospital; the Defendant did not see her as an inpatient. As such, those records should already have been under the Defendant's control. Moreover, the purpose for which the Defendant requests the chart - to prove "that the patient had to be lying down in order for Dr. Tyma to conduct his examination thus controverting L.S.'s trial testimony that she never laid down during the examination in question" and that "Dr. Tyma recommended a follow-up appointment which would have required the patient to call the Wexford office to make the appointment and would have controverted her trial testimony that she made the appointment at the hospital the day of the exam in question." (Petitioner's Concise Statement of Matters Complained of on Appeal, p. 10-12). As with issue 6, above, this would constitute impeachment on a collateral matter and would thus be improper. Moreover, as this Court pointed out at the conclusion of trial, the Defendant's medical records are unlikely to contain any unfavorable information:

> THE COURT: I would point out that I would guess that assuming you had touched these women inappropriately, you would not have made that a part of your hospital records and said, and then I was done, I grabbed her left breast. I don't know this would have been a part of your notes.

(T.T. p. 409).

Insofar as the Defendant wrote his own records, the absence of any indication that the patients were touched inappropriately does not mean that the touching did not occur. See Heilman, *supra* ("an absence of evidence is not evidence of absence"). Even had defense counsel subpoenaed the Jameson Hospital records, the result of the trial would not have changed, and so counsel will not be found ineffective in this regard.

The Defendant also argued that counsel was ineffective for failing to "obtain the medical chart of M.J.S. ▓▓▓▓▓▓▓ before trial." (Petitioner's Concise Statement of Matters Complained of on Appeal, p. 19). The Defendant does not specify which provider(s) whose records he was seeking and, in perhaps the most offensive claim of this Concise Statement, states that the reason for needing Ms. S▓▓'s other records is that "because the medical charts of the other complainants contained a 'gold mine' of impeachment evidence, one would expect to find the same with M.J.S.'s chart." (Petitioner's Concise Statement of Matters Complained of on Appeal, p. 19).

Essentially what the Defendant is saying is that because other women's medical records contained impeachment evidence (though whether it is true impeachment evidence is questionable, see above), M▓ J▓ S▓'s medical records must necessarily also contain impeachment evidence. This is not a sufficient basis, but is rather an offensive generalization among victims. Having already exhibited his disdain for the women (see No. 6, above, regarding "demeanor impeachment evidence"), the Defendant simply assumes that because some of the women had criminal convictions or histories of depression, then they all must have. This is highly improper and is in no way a basis for a claim of ineffectiveness. This claim is utterly meritless.

9. *Ineffectiveness in Closing Argument*

Next, the Defendant challenges counsel's closing argument for his failures to address each victim individually and to make an argument regarding the harassment charges. He avers that had counsel done both, the result would have been different. This Court can assure the appellate court that it would not have been.

28

At the conclusion of trial, defense counsel presented a cogent and thoughtful closing argument, wherein he summarized the charges, discussed reasons why the claims were not credible and also fairly extensively argued that the women were not credible. In this Court's view, defense counsel's argument was entirely appropriate and not lacking in any way. Sitting as the fact-finder, this Court can say with certainty that even had counsel addressed each victim individually or made an argument regarding the summary harassment charges, the result would not have been different. As our Superior Court has already determined, the evidence was more than sufficient to support the convictions, and a different or perhaps more detailed closing argument would not have changed that fact. This was not a case where the evidence was questionable or that this Court was somehow "on the fence", such that the closing argument would have persuaded it one way or another. Rather, the evidence was clear and more than sufficient. Counsel's closing argument was appropriate and in no way gave rise to a finding of ineffectiveness. This claim must fail.

10. *Cumulative Ineffectiveness*

Finally, the Defendant argues that all of his ineffectiveness claims "individually and cumulatively entitle [him] to relief" (Petitioner's Concise Statement of Matters Complained of on Appeal, p. 22). Once again, this claim is meritless.

At the beginning of this Opinion, this Court referenced a law review article by Judge Aldisert of the Third Circuit, wherein he hypothesized that even when reversible error is found, there are usually not more than one or two errors made and, to paraphrase, that raising more issues does not necessarily mean more errors will be found. Here, the Defendant raised 29 separate claims of ineffectiveness, and though some warranted extensive discussion from this

29

Court, some of them were so spurious that they clearly should not have been raised. Simply listing claim after claim after claim when there is no reasonable basis to support a finding that the verdict would have been different does not amount to ineffectiveness and, similarly, counsel will not be found *even more ineffective* when multiple claims are raised. It is understandable that the Defendant and his family were upset by the verdicts, however, the mere fact that the verdicts were guilty does not mean that counsel was ineffective. To the contrary, this Court felt that Mr. Levenson was obviously well-prepared for trial, that he engaged in effective witness examinations, both on direct and cross-examination, that he made appropriate and effective arguments and, ultimately, that he presented the best defense he could with the facts he was given. As discussed above, there was no basis for a finding of ineffectiveness on any of the specific allegations, nor is there a basis for a finding of cumulative ineffective assistance. This claim must also fail.

Accordingly, for the above reasons of fact and law, this Court's Order of June 25, 2015, which dismissed the Defendant's Post Conviction Relief Act Petition without a hearing, must be affirmed.

BY THE COURT:

_____, J.

Dated: May 12, 2016